941 A.2d 1141

**Edinson Herrera RAMIREZ a/k/a Edinson Merrera–Ramirez**

v.

**STATE of Maryland.**

**No. 2383, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

Feb. 8, 2008.

James Q. Butler (Nathan M. Peak, Butler Legal Group, PLLP, on the brief), Washington, DC, for appellant.

Diane Keller (Douglas F. Gansler, Attorney General, on the brief), for appellee.

Panel: KRAUSER, C.J., HOLLANDER, and BARBERA, JJ.

HOLLANDER, J.

Following a trial in July 2005, a jury in the Circuit Court for Carroll County convicted Edinson H. Ramirez, appellant, of numerous counts related to a home invasion and armed robbery.[1] At sentencing on November 17, 2005, the court imposed a total term of 95 years' imprisonment.

---

1. In particular, appellant was convicted of two counts of armed robbery, two counts of robbery, one count of conspiracy to commit armed robbery, two counts of first degree assault, use of a handgun in the

Shortly before the jury delivered its verdict, the judge disclosed that the alternate juror briefly entered the jury deliberation room with the regular jurors when the jury was first released to begin deliberations. At that time, appellant did not voice any objection or seek any particular relief. The jury then returned its verdict. A few days later, the State filed a "Motion for Appropriate Relief in Clarification of Alternate Juror's Presence in Jury Deliberation Room for Establishment of a Factual Appellate Record," which appellant opposed. At an evidentiary motion hearing held in October 2005, appellant moved, for the first time, for a mistrial or a new trial, claiming prejudice based on the presence of the alternate juror at the outset of jury deliberations. The court denied appellant's motions in an Order entered November 8, 2005.

This appeal followed. Ramirez poses a single question, which we quote:

Did an error occur when the alternate juror retired, along with the twelve regular jurors, to the jury room for deliberations and was that error aggravated by the trial court speciously obtaining testimony from the alternate juror as to what occurred in the jury room, ignoring other extrinsic and obvious evidence and finding that the defendant was not prejudiced?

For the reasons set forth below, we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

A detailed recitation of the evidence presented at trial is not necessary to the resolution of this appeal. Therefore, we note only that appellant's convictions arose from horrifying events that occurred on the night of October 11, 2004, when appellant and another man, masked and wielding guns, entered the home of Rodney and Linda Hidey; forced them into the

---

commission of a crime of violence, felony theft, first degree burglary, and possession of an unregistered rifle or shotgun.

basement with their six-year-old daughter; shot Mr. Hidey; hit him repeatedly in the head with a gun; forced Ms. Hidey to open a safe in the basement; and fled with more than $80,000 kept in the safe.

After counsel's closing argument on July 15, 2005, the court did not formally excuse the alternate juror. When the jury was excused to deliberate at 2:58 p.m., the alternate accompanied the jurors into the jury room. She remained there for a few minutes, until removed by the bailiff. The parties were not immediately told what had happened.

At 5:53 p.m., as the jury was about to return with a verdict, the trial court stated:

All right. Counsel, before we bring the jury in, it came to my attention that the alternate went in with all of the evidence and we retrieved her a few minutes later. So, I don't know that there's—can be any prejudice to anybody, given how long the jury was out, but for the record, that is noted, I will estimate, five minutes. I haven't got any detailed timing, but she was removed by the Clerk and the Jury Bailiff at my direction.

Neither the prosecutor nor defense counsel voiced any objection or concern at that time. Nor did appellant move for a mistrial or seek any other relief. The jury then returned to the courtroom, announced its verdict, was polled, and was dismissed, all without any comment from the defense. The ten-day deadline for filing a motion for new trial passed without any motion filed by the defense. *See* Rule 4–331(a).

On July 27, 2005, the State filed a "Motion for Appropriate Relief in Clarification of Alternate Juror's Presence in Jury Deliberation Room for Establishment of a Factual Appellate Record." Relying on *Stokes v. State*, 379 Md. 618, 843 A.2d 64 (2004), in which the Court of Appeals considered the presence of alternate jurors during jury deliberations, the State asked the trial court to hold a hearing to establish a factual record, and to permit the State to attempt to "overcome the 'presumption of prejudice' (*i.e.*, plain error)" flowing from the alternate juror's presence in the jury room. Appellant moved to dis-

miss the motion on the ground that such a proceeding was not authorized by statute or case law.

In an "Order of Court" entered September 27, 2005, the court stated that "it would be appropriate to grant the State's Motion, in part, to allow it to present evidence for the record as to this issue." It continued:

The presiding Judge will not be called as a witness to testify by either party. By the same token, none of the active jurors who ultimately participated in the verdict will be allowed to testify in any manner, including the Foreman. The Court believes that testimony from either is prohibited by the Rules.

The Court believes that any other witness with any evidence to present may be called to testify, including but not limited to the Court Clerk, the Jury Bailiff, and potentially the alternate juror. The alternate juror, at least by inference, was excused at the time the incident occurred and was no longer a part of the jury that ultimately determined the verdict. The Defense is free to call any witnesses it desires, with the exceptions stated above.

The court held an evidentiary motion hearing on October 5, 2005. As an initial matter, appellant renewed his objection to the hearing, and the court heard argument from counsel. The court then said, in part:

Well, I have given this a great deal of thought, and I realize we are into several different areas that overlap. But the way I read *Stokes,* the issue of whether or not the alternate juror was present during deliberations is presumed when the door is closed. But the only way you can have a presumption is if it is rebuttable.

\* \* \*

Now, as to the issue of the alternate juror testifying, at least impliedly she was discharged and no longer a part of the jury that was deliberating and eventually rendered the verdict. I think that inquiry as to her is limited to whether or not deliberations had begun and not what they were.

\* \* \*

*Now, we find ourselves in a posture where there is no
motion by the defense for a mistrial or a new trial.* We
also find ourselves in a posture where in the last analysis we
really have a situation where the Appellate Courts will be
devoid of any information about this. There is no jury to be
influenced or prejudiced by this occurring. It will simply be
a record from which they can make an ultimate determina-
tion.

I believe that that should be done, simply because I
disagree with you strongly about the issue that it is plain
error or that it violated constitutional rights. It is arguable
at least, and again, *there is no case that addresses this, that
the defense's failure to have raised the issue may constitute
a waiver.*

\* \* \*

There is precious little doubt in my mind that this case
will be appealed and that the Appellate Courts will have to
sort it all out. But at this juncture we are in a posture
where it is unexplained. *I think the State has a right to
make a record for appellate purposes* only to explain it, and
it is up to the Appellate Courts what to do with it.

They can, conceivably, take the case on appeal and re-
mand it to me to conduct a hearing about the issue. Well,
we are going to do it in this order, and then we will go from
there.

(Emphasis added.)

The hearing continued, over appellant's continuing objec-
tion. The State presented two witnesses: the alternate juror
and the bailiff who retrieved her.

Barbara Seabrease, the alternate, testified as follows:

[PROSECUTOR]: And directing your attention then to
approximately 3:00 p.m. in the afternoon on Friday the 15th
of '05, all of the evidence was concluded, the closing argu-
ments and the jury was released to go into the jury room.
Do you recall that?

[MS. SEABREASE]: Yes, I do.

[PROSECUTOR]: And what did you do? Just tell us, step by step, what you did at that point in time.

\* \* \*

[MS. SEABREASE]: After the closing argument I just walked into the jury—the deliberation room with the rest of the jurors and—

\* \* \*

[PROSECUTOR]: Okay. And what did you do?

[MS. SEABREASE]: And I walked into the room and I just sat down for a minute, and we started to get a soda and there was some candy on the table. And then I got up and then I went into the ladies room. And when I came out of the ladies room—

[PROSECUTOR]: How long do you think you were in the—I know this might be an embarrassing question, but how long do you think you were in the ladies room?

[MS. SEABREASE]: Just for maybe two minutes. Maybe three minutes.

[PROSECUTOR]: Okay.

[MS. SEABREASE]: And as I came out of the ladies room,—

[PROSECUTOR]: Did you close the door behind you when you went into the ladies room?

[MS. SEABREASE]: Oh, yes. I did.

[PROSECUTOR]: Okay. Yes. That is a separate room. Right?

[MS. SEABREASE]: Yes. Yes. It's a separate room, and I was in there. Then, when I came out, the Bailiff and the Clerk from the court, they were asking, "where is the alternate?" And so I raised my hand and I said, "Here I am."

I didn't know what they—I thought maybe there was some emergency they were trying to call me for that had

happened, that someone was calling for me, and they said that I wasn't supposed to be in there. And then they—with that, they said to get my things, and then I just walked out of the room with them at that time.

[PROSECUTOR]: Okay. So, I mean, your best estimate. How long do you think you were in the jury room, including the time that you were in the ladies room?

[MS. SEABREASE]: I would—my guess would be it was just a couple of minutes. At the very most it was five minutes, but I was in the ladies room for about two or three minutes. Then it was a total of—again, it was probably maybe five minutes at the very most.

[PROSECUTOR]: In that time, during that time you were in there, did you participate in any deliberations?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[PROSECUTOR]: Go ahead. I couldn't hear you because of the objection.

[MS. SEABREASE]: No. I did not.

[PROSECUTOR]: Did you witness any deliberations taking place?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled. Go ahead and answer the question.

[MS. SEABREASE]: No.

[PROSECUTOR]: Did you discuss this matter with anyone in the room in any way, shape or fashion? That is the trial, the case or the evidence?

[MS. SEABREASE]: No.

[PROSECUTOR]: Okay. And when you left the room, you were, I believe, numbered alternate number two?

[MS. SEABREASE]: Yes, I was.

[PROSECUTOR]: Okay. When you left the jury room, how many jurors remained in the room?

[MS. SEABREASE]: There was [sic] the 12 original jurors in the room.

[PROSECUTOR]: So you were the 13th?

[MS. SEABREASE]: Yes.

[PROSECUTOR]: Okay.

On cross-examination, Ms. Seabrease reiterated that she was only in the jury room for around five minutes. The following ensued:

[DEFENSE COUNSEL]: So, the case concluded. The jury was dismissed to the jury room.

[MS. SEABREASE]: Yes.

[DEFENSE COUNSEL]: You went into the jury room with the 12 jurors?

[MS. SEABREASE]: Yes, I did.

[DEFENSE COUNSEL]: The jury room door was closed?

[MS. SEABREASE]: Yes.

[DEFENSE COUNSEL]: And you were in the jury room with those 12 jurors with the door closed?

[MS. SEABREASE]: Yes.

\* \* \*

[DEFENSE COUNSEL]: Did you have with you your notebook that you had during the trial?

[MS. SEABREASE]: I just put it on the table when I walked in.

[DEFENSE COUNSEL]: And when you walked in and you put the notebook on the table, then you went into the bathroom?

[MS. SEABREASE]: Uh-huh.

[DEFENSE COUNSEL]: And during the time that you were in the bathroom the notebook was on the table?

[MS. SEABREASE]: Yes.

[DEFENSE COUNSEL]: When you came out of the bathroom, did you pick the notebook up?

[MS. SEABREASE]: No, I did not.

[DEFENSE COUNSEL]: When you left the jury room, did you have the notebook with you?

[MS. SEABREASE]: No, I did not.

[DEFENSE COUNSEL]: Did you take the notebook and turn it over to anybody at that point time?

[MS. SEABREASE]: No, I did not.

[DEFENSE COUNSEL]: So, as far as you know, the notebook was left on the jury table at the time that the deliberations started?

[MS. SEABREASE]: Yes.

[DEFENSE COUNSEL]: So, your notebook was in the jury room after the jury room door was closed and after you had left. Is that correct?

[MS. SEABREASE]: That's correct.

[DEFENSE COUNSEL]: Now, did you say anything at all during the course of your being in the jury room? I don't want to know what you said. I just want to know did you say anything at all?

[MS. SEABREASE]: Not that I remember. No, I don't.

[DEFENSE COUNSEL]: You didn't exchange any words at all with any of the other jurors?

[MS. SEABREASE]: No, I didn't.

[DEFENSE COUNSEL]: Were any of the other jurors talking at the time that you were in there?

[MS. SEABREASE]: I don't remember anybody talking. We just walked into the room and we were just getting some candy, getting some soda and then people were just going to the bathroom, and I was the first person to just go into the bathroom. And as I came out of the bathroom, like I said, the Bailiff and the Clerk were there looking for me.

[DEFENSE COUNSEL]: But was there any conversation going on?

[MS. SEABREASE]: There probably was some conversation going on.

[DEFENSE COUNSEL]: And there was conversation going on during the time that you were in the bathroom?

[MS. SEABREASE]: I don't know. I was in the bathroom. So I—

[DEFENSE COUNSEL]: You couldn't hear anything?

[MS. SEABREASE]: I couldn't hear anything.

[DEFENSE COUNSEL]: And when you came out and the court Clerk and the Bailiff were there, was there any conversation going on in the jury room at that time?

[MS. SEABREASE]: There may have been, but I was just—they were asking for me, and there might have been some conversation. But they were calling me. So I just went with them.

Bailiff Keith Woodburn was sworn as the jury bailiff in the case. He testified that, after closing argument, "[a]ll 13 jurors got up and went into the [jury] room and the door was shut." Then, "several minutes" after the door to the jury room was shut, the court clerk, Peggy Galloway, informed him that an alternate had gone in the jury room with the jury. Accordingly, he went into the room to remove the alternate. Woodburn recalled: "Nobody with the jury was seated. They were all in small groups around the table. Nobody was seated at the table." Moreover, he claimed that "there was no deliberations going on." Woodburn called out for the alternate juror, who was standing in the room. He advised her that she "would have to be removed from the area because she wasn't supposed to be in there." Woodburn also retrieved Seabrease's "pad and pencil." He had not seen anyone looking at Seabrease's notes. Woodburn estimated that the entire incident lasted no more than five minutes, although he initially gave a written statement in which he said it could have been five to seven minutes.

The State also introduced an excerpt of the trial transcript. It showed that the jury entered the jury room at 2:58 p.m., and reached its verdict at 5:53 p.m.

After the State completed its presentation of evidence, appellant moved for a mistrial or, in the alternative, a new trial under Rule 4–331(b). The prosecutor responded that, under Rule 4–331(a), the motion was untimely; appellant was required to have moved for a new trial within ten days of the verdict. Defense counsel countered that, in addition to its

motion under subsection (b), the defense moved for a new trial under Rule 4–331(c), "because of the issue of the notebook having been brought up for the first time here today."

By written Order dated November 8, 2005, the trial court denied the defense motions for mistrial or a new trial. In an Opinion accompanying the Order, the court stated:

The Court's recollection of what transpired at trial·and the events leading up to the time the alternate juror was present in the jury deliberation room are basically the same as that which was the subject of testimony at the Hearing on October 5, 2005. In the course of closing arguments at trial, Defense counsel addressed most, if not all, of the sixty-six (66) exhibits introduced by standing before the Jury and addressing each exhibit and arguing to the Jury that each exhibit had no significance to establish the Defendant's guilt. Thereafter, each exhibit was dropped by defense counsel on the floor before the feet of the Jury. No objection was lodged by the State to this form of argument, and at the conclusion of all closing arguments, it was necessary for the Clerk and Jury Bailiff to retrieve all the exhibits and organize them, so that they could be delivered into the Jury Room for consideration during deliberations. The Court had not formally excused the Alternate Juror at this time, but had recessed in order to allow the Court personnel and the parties involved in civil cases scheduled to follow deliberations to prepare for their hearings and reconvene.

\* \* \*

The Defense argues that the fact that the alternate juror entered the Jury Room, laid her notebook of notes on the jury table while she went to the restroom within the Jury Deliberation Room, and it was present there until she was retrieved by the Jury Bailiff, may constitute a possibility that her notes were involved in deliberations. On this basis, the Defense made a Motion for Mistrial, or in the Alternative, Motion for New Trial, orally at the conclusion of the hearing on October 5, 2005. The motion for a Mistrial, or in the Alternative, Motion for New Trial was opposed by the

State. There are considerable issues relative to the lateness of the Motion for Mistrial, or in the Alternative, Motion for New Trial, due to the fact that this Motion was not orally made at the time this issue was raised prior to the verdict having been received by the Court. The Court will assume, without deciding, that the Motion was timely raised as to this issue.

The Court has carefully reviewed *Stokes v. State*, 379 Md. 618 [843 A.2d 64] (2004), and some of the language contained in *Stokes* deals with issues of jury deliberations. The Court finds that there was no prejudice to the Defendant in any way by what occurred at trial. The Jury was out for deliberations for nearly three (3) hours, and by all versions of the evidence, the incident that gave rise to this situation lasted no longer than five (5) minutes immediately after the Jury had retired to deliberate.

There were more than sixty-six (66) exhibits provided at trial, which were kept in several boxes and required a separate table in the courtroom on which to place them. The Court finds that it was appropriate for the Jury Bailiff and the Clerk to gather and reorganize all of the exhibits and produce them to the Jury in an orderly manner. The Court also finds that the time frame is of no consequence and that deliberations had not as yet begun. The Court will, therefore, enter the attendant Order denying the Defendant's oral Motion for Mistrial, or in the Alternative Motion for a New Trial in this case.

## DISCUSSION

### I.

Appellant contends that the presence of the alternate juror in the jury room "at any time" after the jury retired to deliberate gives rise to a "presumption of prejudice" and "vitiates the verdict," even if defense counsel "failed to object, to the presence of the alternate." Relying on *Hayes v. Maryland*, 355 Md. 615, 636, 735 A.2d 1109 (1999), appellant asserts that jury deliberations are "deemed to have com-

menced" when the door to the jury room closes, and therefore the alternate was present during deliberations. Based on *Stokes v. State*, 379 Md. 618, 630, 843 A.2d 64 (2004), he further insists that the alternate's presence was "a fundamental irregularity of constitutional proportions," and therefore the trial court should have declared a mistrial. In his view, even the brief presence of the alternate juror in the jury room during deliberations is an error that cannot be "cured." Although appellant concedes that the State is not precluded from attempting to rebut the presumption of prejudice, he posits that the State "failed to establish that the alternate juror's presence in the jury room was incidental."

In addition, appellant contends that the trial court erred procedurally by taking the testimony of the alternate juror to ascertain whether the jury had begun to deliberate while the alternate was present. He also claims that the court erred by failing to limit its examination to extrinsic evidence. As soon as the court revealed what happened, asserts appellant, "the State should have called the Jury Bailiff as a witness to testify to 'objective and extrinsic' evidence...." In his view, the State's "failure to raise this issue in a timely manner" amounts to a "waiver" of its right to attempt to rebut the claim of prejudice.

Yet, appellant concedes that the alternate juror's "length of time" in the jury room "is not dispositive" of the issue. He also recognizes that, ordinarily, "[t]he State is not precluded from attempting to rebut the presumption of prejudice," and acknowledges that "[t]he court could have considered matters such as, the length of time the alternate was in the jury room, did the alternate come out on her own or did someone have to enter to retrieve her, was the door closed or not, did she enter or exit the jury room with an apparent ulterior purpose (such as to just use the restroom or to retrieve her personal property)." Nevertheless, appellant argues:

> The trial record unequivocally demonstrated that the alternate juror was present during deliberation as the "door had been closed" and the alternate juror was present during said deliberations for upward of 7 minutes until the alter-

nate was removed from deliberations. Further, the trial court erred in questioning the alternate juror as to the happenings inside the deliberation room, instead of examining the extrinsic evidence which demonstrates the alternate juror's presence during deliberation.

The State responds that appellant "failed to preserve his complaint regarding the alternate juror's brief presence in the jury room," because "he did not alert the court that the alternate juror had not been excused, did not object or request any remedy when informed about the juror's brief presence, did not object when the jury's verdict was enrolled, and did not move for a new trial in a timely manner." If appellant had "informed the court that the alternate juror had not been discharged," argues the State, "the juror never would have entered the jury room in the first instance." [2] The State adds: "Had Ramirez raised an objection at the time he learned about the alternate juror's presence in the jury room, before the verdict was enrolled, the court unquestionably could have inquired whether deliberations had begun.[ ]" In its view, "the claim unquestionably could have been presented to the trial court before the verdict was enrolled," but "defense counsel elected not to do so . . . ."

According to the State, appellant is "mistaken" in his claim that "his failure to object to the alternate's presence when the court announced what had happened is of no significance in evaluating his demand for reversal. . . ." Citing Md. Rule 8–131(a), it insists that any claim of error is subject to a waiver analysis, and underscores that because "Ramirez did not raise any objection whatsoever at trial . . . his current complaint therefore should be rejected on preservation grounds."

As to appellant's failure to move for a mistrial until after the post-trial motion hearing on October 5, 2005, the State asserts: "It is axiomatic that a mistrial, by its very nature, is unavailable once the verdict is final." Moreover, the State contends:

---

2. There is no indication in the record that either party realized that the alternate entered the jury room. Moreover, it would appear that the State had equal responsibility to "alert the court. . . ."

"Ramirez's claim fares no better when considered as a motion for new trial. 'A post trial motion cannot be permitted to serve as a device by which a defendant may avoid the sanction for nonpreservation.' *Torres v. State,* 95 Md.App. 126, 134, 619 A.2d 566 (1993)." In addition, the State contends that appellant's motion for new trial must fail because it was untimely. In this regard, it points out that Rule 4–331(a) permits a court to order a new trial, "in the interest of justice," on motion of the defendant filed within ten days after a verdict, but appellant's motion was not brought within this ten-day period. Rather, the jury's verdict was enrolled on July 15, 2005, and appellant's motion for new trial was not made until October 5, 2005. In the State's view, appellant's reliance on Rule 4–331(b) is also misplaced, as there was no fraud, mistake, or irregularity justifying exercise of the court's revisory power. Similarly, the State argues that Rule 4–331(c), pertaining to newly-discovered evidence, is inapplicable. Further, the State asserts: "Ramirez does not request plain error review, and the circumstances of this case would not support this extraordinary remedy."

Even if appellant's claim is considered on the merits, the State maintains that "it would fail on the record...." In this regard, the State posits that the trial court "correctly found that the alternate juror had left the jury room before jury deliberations began and that there was no prejudice to Ramirez from the alternate's very brief presence in the room."

## II.

As we have indicated, appellant challenges the trial court's authority to conduct a hearing to determine whether the State rebutted the presumption of prejudice; the court's determination that jury deliberations had not yet begun when the alternate was in the jury room; and the court's finding that the State rebutted the presumption of prejudice. He also contends that, when the court informed the parties about the error relating to the alternate, it was incumbent on the State to immediately "attempt[ ] to rebut the presumption of prejudice to the Defendant...." In his view, the State's failure to

do so amounted to a waiver by the State of its right to rebut the claim of prejudice. The State argues, *inter alia*, that appellant waived his contentions, because he did not object when he learned about the problem, nor did he timely move for a mistrial or a new trial.

As a preliminary matter, we consider the waiver/preservation claims.

Immediately before the jury was to deliver its verdict, the court disclosed that, when the jurors were released to deliberate, the alternate juror briefly entered the jury room with the regular jurors. As we have observed, at that time, appellant did not voice an objection to the alternate juror's presence, nor did he move for a mistrial or a new trial. It was not until October 5, 2005, nearly three months after the jury returned its verdict on July 15, 2005, that appellant sought the remedies of a mistrial or a new trial.

The question here is whether the waiver doctrine applies to a claim of prejudice based on the presence of an alternate juror during jury deliberations. We have not uncovered any reported opinion in Maryland setting forth what steps the State or the defendant must take, *if any*, to preserve for appeal a claim arising from the alleged presence of an alternate juror during jury deliberations.

As we consider the waiver issue, we are mindful that in *Stokes, supra*, 379 Md. at 639, 843 A.2d 64, the Court admonished:

"The rule formulated by the overwhelming majority of the decided cases is that the presence of an alternate, either during the entire period of deliberation preceding the verdict, *or* his presence at any time during the *deliberations* of the twelve regular jurors, is a fundamental irregularity of constitutional proportions which requires a mistrial or vitiates the verdict, if rendered. And this is the result notwithstanding the defendant's counsel consented, or failed to object, to the presence of the alternate." [3]

---

**3.** In general, federal and state jurisdictions fall into three categories as to this issue: Those that consider the error reversible *per se;* those that

(Quoting *State v. Bindyke,* 288 N.C. 608, 220 S.E.2d 521, 531 (1975)) (footnote and other citations omitted).

However, as the State notes, and as we recently observed in *Brockington v. Grimstead,* 176 Md.App. 327, 350, 933 A.2d 426 (2007), "preservation was not at issue [in *Stokes* ] because Stokes's counsel indeed objected below." Moreover, while the *Stokes* Court quoted the North Carolina case of *Bindyke, supra,* 220 S.E.2d at 531, it qualified the broad language of that case when it said, 379 Md. at 639 n. 10, 843 A.2d 64:

> Since the Supreme Court decision in *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), some jurisdictions have modified this view on the issue, particularly when there was no objection below and the threshold issue on appeal is whether the issue is preserved for appellate review, and then the matter is considered under the plain error doctrine. *See id.* at 739, 113 S.Ct. at 1780, 123 L.Ed.2d at 523 (stating "the issue here is whether the alternates' presence sufficed to establish remedial authority under Rule 52(b), not whether it violated the Sixth Amendment or Due Process Clause"). The issue of preservation for appellate review or waiver is not an issue in the case *sub judice* because appellant objected to the presence of alternate jurors in the jury room.

■ Appellant has not directed us to any authority that requires the State to request an immediate hearing in order to preserve its right to attempt to rebut a claim of prejudice. Notably, any error due to the improper presence of an alternate would have occurred when the alternate was physically present in the jury room; appellant could not have suffered further prejudice no matter when the evidentiary hearing was held. Moreover, the State's conduct must be viewed in light of appellant's failure to have complained of the occurrence at the time he learned of it. Therefore, we conclude that the

---

create a presumption of prejudice that may be overcome; and those that recognize the possibility of harmless error. Michelle Migdal Gee, *"Presence of Alternate Juror in Jury Room as Ground for Reversal of State Criminal Conviction,"* 15 A.L.R.4th 1127 (1982, 2006 Supp.)

State did not waive its right to attempt to rebut the claim of prejudice, nor did trial court err in conducting the hearing several weeks after the trial.

With respect to a claim of waiver based on appellant's failure to object immediately upon learning of the alternate's presence, we are mindful that the alleged error was not one that lent itself to a cure, even if appellant had objected; a prompt objection may well have been futile. To put it colloquially, the horse was already out of the barn; the bell could not be unrung. Even if a curative instruction could cure such an error at the outset of deliberations, here the jury had already reached its verdict by the time the court disclosed what had occurred.

The case of *Williams v. State,* 131 Md.App. 1, 748 A.2d 1, *cert. denied,* 359 Md. 335, 753 A.2d 1032 (2000), is probative. In that case, we considered the defendant's failure to object to an arguably uncurable error, and rejected as "legally flawed" the appellant's claim that "there was no point in objecting to an incurable error...." *Id.* at 40, 748 A.2d 1. The Court found "completely untenable" the appellant's claim that he was relieved from the preservation requirement because an objection "could have accomplished nothing...." *Id.* at 43, 748 A.2d 1. Speaking for this Court, Judge Moylan explained, *id.* at 40–41, 748 A.2d 1:

> If in the course of a trial an error occurs which is, *arguendo,* indisputably incurable, an objection is still called for so that the court and counsel may explore the necessity for, *inter alia,* an immediate mistrial. In this case, for instance, the redaction error in question occurred in the course of the State's case. * * * If the granting of a timely motion for a mistrial were a certainty because an incurable error had occurred, it would be unforgivable simply to sit back and to condemn the court to wasted hours and wasted days in an exercise in utter futility.
>
> Even if defense counsel is sure that irredeemable error has occurred, he is required, at the peril of non-preservation, to bring it to the immediate attention of the court.

The sin to be avoided is that of the defense's sitting back and waiting to see what the verdict is going to be before deciding whether to play its "trump" card. Saving precious judicial resources from needless waste is more important than giving a defendant "two bites out of the apple." *Even in the face of incurable error, there is no forgiveness of the responsibility to make timely objection.* (Emphasis added.)

■ Even assuming, *arguendo*, that, under the circumstances of this case, appellant was relieved of an obligation to object immediately, we are readily satisfied that a waiver/preservation analysis applies to appellant's request for the remedy of either a mistrial or a new trial. We are equally convinced that his claim of error is barred by those principles. We explain.

■ The presence of an alternate during jury deliberations does not automatically compel a new trial. Appellant had to ask for relief, by way of a mistrial or a new trial, yet he did not do so until weeks after the verdict was rendered. *Cf.* Md. Rule 4–323(c) (stating, in part, that for purposes of appeal a party should make known to the trial court the "action that the party desires the Court to take. . . .")

■ As the State points out, "a mistrial, by its very nature, is unavailable once the verdict is final." *See* Black's Law Dictionary 1023 (8th ed.1999) (defining "mistrial" as: "A trial that the judge brings to an end, without a determination on the merits, because of a procedural error or serious misconduct occurring during the proceedings" or "A trial that ends inconclusively because the jury cannot agree on a verdict.") A defendant who fails to make a timely motion for mistrial "risks its proper denial on that ground alone." *Hill v. State*, 355 Md. 206, 220, 734 A.2d 199 (1999). Therefore, we conclude that appellant's undue delay in requesting a mistrial resulted in a waiver of his claim to such relief.

■ In addition, Ramirez was not entitled to the remedy of

a motion for new trial under Md. Rule 4–331.[4] We elaborate.

Rule 4–331, captioned "Motions for New Trial," states, in part:

(a) **Within Ten Days of Verdict.** On motion of the defendant filed within ten days after a verdict, the court, in the interest of justice, may order a new trial.

(b) **Revisory Power.** The court has revisory power and control over the judgment to set aside an unjust or improper verdict and grant a new trial:

\* \* \*

(2) in the circuit courts, on motion filed within 90 days after its imposition of sentence.

Thereafter, the court has revisory power and control over the judgment in case of fraud, mistake, or irregularity.

(c) **Newly Discovered Evidence.** The court may grant a new trial or other appropriate relief on the ground of newly discovered evidence which could not have been discovered by due diligence in time to move for a new trial pursuant to section (a) of this Rule:

(1) on motion filed within one year after the date the court imposed sentence or the date it received a mandate issued by the Court of Appeals or the Court of Special Appeals, whichever is later. . . .

None of the three subsections of this Rule applied to appellant's motion. As noted, appellant did not move for a new trial within ten days of the verdict, as required by Rule 4–331(a). Therefore, his motion was untimely under Rule 4–331(a).

Rule 4–331(b) empowers a court "to set aside an unjust or improper verdict" on a motion filed within ninety days of sentencing.[5] This section was equally inapplicable. In *Isley*

---

4. Appellant does not argue that the court erred in denying his motion for new trial. However, the State discusses Rule 4–331 in its brief, and it is relevant to our waiver analysis.

5. In its brief, the State omits reference to this ground.

*v. State,* 129 Md.App. 611, 626, 743 A.2d 772 (2000), overruled on other grounds by *Merritt v. State,* 367 Md. 17, 24, 785 A.2d 756 (2001), we explained that this provision derived from former Rule 759b, titled " 'Motion in Arrest of Judgment,' an archaic term of art[.]" *Isley* continued, 129 Md.App. at 627, 743 A.2d 772:

> The Motion in Arrest of Judgment has long been recognized in federal criminal practice and is provided for by Criminal Rule of Procedure 34. In *United States v. Sisson,* 399 U.S. 267, 280–83, 90 S.Ct. 2117, 26 L.Ed.2d 608, 619–20 (1970), the Supreme Court described how the motion is concerned only with matters "on the face of the record" (the pleadings, the form of the verdict) and not with the evidence or the trial proceedings:
>
>> An arrest of judgment was the technical term describing the fact of a trial judge refusing to enter judgment on the verdict because of an error appearing on the face of the record that rendered the judgment invalid.... For the purpose of this case *the critical requirement is that a judgment can be arrested only on the basis of error appearing on the 'face of the record, and not on the basis of proof offered at trial* .... This venerable requirement of the common law has been preserved under the Federal Rules of Criminal Procedure, for the courts have uniformly held that in granting a motion in arrest of judgment under Rule 34, a [federal] district court must not look beyond the face of the record.... Therefore, ... a decision based on evidence adduced at trial cannot be one arresting judgment. (Emphasis supplied).

Appellant did not explain at the motion hearing, and omits any mention now, of how the alleged error he complained of appeared on the "face of the record." As we said in *Love v. State,* 95 Md.App. 420, 423, 621 A.2d 910, *cert. denied,* 331 Md. 480, 628 A.2d 1067 (1993):

> Every conceivable wrong occurring in the course of a criminal trial does not necessarily give rise to a corresponding remedy. *A fortiori,* it does not always trigger the particular remedy invoked by the defendant who has argu-

ably suffered the wrong. The Motion for New Trial is one of the post-trial remedies. It is by no means, however, a never-failing panacea, available whenever and however outraged justice may beckon. It is designed to correct some, but not all, flaws that may have marred a trial.

Nor can appellant rely on the court's power under Rule 4–331(b) to revise a judgment in case of "fraud, mistake, or irregularity." In *Minger v. State*, 157 Md.App. 157, 170, 849 A.2d 1058 (2004), we asserted that the word "mistake" "has uniformly been interpreted to mean jurisdictional error only." *Minger*, 157 Md.App. at 172, 849 A.2d 1058. *See Tandra S. v. Tyrone W.*, 336 Md. 303, 317, 648 A.2d 439 (1994), superseded on other grounds by amendment to Md. Code, Fam. Law § 5–1038(a) (1995); *Skok v. State*, 124 Md. App. 226, 242 n. 8, 721 A.2d 259 (1998); *aff'd*, 361 Md. 52, 760 A.2d 647 (2000). Appellant alleges no such jurisdictional defect, nor does he allege fraud. Moreover, Ramirez's claim does not constitute an "irregularity" under Rule 4–331(b)(2). "Irregularity" typically means "irregularity of process or procedure." *Minger*, 157 Md.App. at 171, 849 A.2d 1058. We explained in *Minger*:

> "Irregularities warranting the exercise of revisory powers most often involve a judgment that resulted from a failure of process or procedure by the clerk of a court, including, for example, failures to send notice of a default judgment, to send notice of an order dismissing an action, to mail a notice to the proper address, and to provided for required publication."

*Id.* at 174, 849 A.2d 1058 (quoting *Thacker v. Hale*, 146 Md.App. 203, 219–20, 806 A.2d 751, *cert. denied*, 372 Md. 132, 812 A.2d 288 (2002)) (citations omitted in *Minger* ). Conversely, "irregularity" generally does not connote " 'a departure from truth or accuracy of which a defendant had notice and could have challenged.' " *Id.* at 175, 849 A.2d 1058 (quoting *Weitz v. MacKenzie*, 273 Md. 628, 631, 331 A.2d 291 (1975)) (emphasis omitted). Here, appellant had notice of the error—the alternate juror's presence in the jury room—before the verdict, and he could have challenged it at that point.

 Moreover, appellant cannot rely on Rule 4–331(c), relating to newly discovered evidence. "Under subsection (c) ... it is strictly required not only that the evidence be newly discovered but that it be both 1) material and 2) evidence which 'could not have been discovered by due diligence in time to move for a new trial pursuant to section (a).'" *Isley,* 129 Md.App. at 632, 743 A.2d 772 (quoting *Love,* 95 Md.App. at 428–29, 621 A.2d 910); *accord Miller v. State,* 380 Md. 1, 28, 843 A.2d 803 (2004). Although appellant does not pursue this argument on appeal, his attorney suggested at the motion hearing that "an appropriate motion would be available" under Rule 4–331(c) "because of the issue of the notebook having been brought up for the first time today." This "notebook" was the alternate juror's notes, which the bailiff claimed he removed from the jury room when he entered the room to remove the alternate juror. It was not "newly discovered evidence" within the meaning of Rule 4–331(c). The parties knew about the alternate juror's presence in the jury room before the verdict was rendered, and surely would have seen, during the course of trial, that some jurors were taking notes during the trial. Therefore, the presence of the alternate's notes in the jury room easily could have been discovered at the time of the court's disclosure.

Cases from other jurisdictions support our conclusion as to waiver. In *Commonwealth v. Casey,* 442 Mass. 1, 809 N.E.2d 980, 983 (2004), a court officer informed the judge that the sole alternate juror had accompanied the jury into the jury room at the very beginning of deliberations the previous day. The judge commented that "[i]t probably is grounds for a mistrial," but sought the views of counsel. *Id.* The defendant's attorney said: "Even though it may be grounds for a mistrial and if the court would entertain, I'd reserve on that question. We've got a jury out." *Id.* On the prosecutor's suggestion, the judge inquired of the alternate juror. The brief questioning revealed that the alternate juror "walked in for maybe two minutes" after deliberations had begun, asked a question, and then left the jury room. *Id.* The judge did not ask the alternate juror what he had asked, but concluded that the

alternate juror had not "participated in any meaningful way in deliberations." *Id.* The jury deliberated for approximately two hours and forty minutes on the second day before returning guilty verdicts. *Id.* The defendant unsuccessfully moved for a new trial, citing the alternate's presence in the jury room. *Id.* On appeal, the court held that the defendant "had the opportunity to move for a mistrial and request a voir dire to determine what the alternate juror asked the deliberating jurors." *Id.* at 984. Notably, the court said: "The defendant's failure to pursue the matter when he learned of the alternate juror's presence in the jury room constitutes waiver." *Id.*

In *State v. Rocco,* 119 Ariz. 27, 579 P.2d 65 (App.1978), the bailiff noticed that the alternate had entered the jury room for about a minute, but "no group action of any sort had been taken by the jury prior to or during this intrusion." *Id.* at 67. The trial court asked the defendant if he wanted to move for a mistrial, noting that "it was possible fundamental error to allow the jury to continue its deliberations . . . .", *id.,* but the defendant did not do so. On appeal, the court stated, *id.:*

> The appellant will not be permitted to wait until after an unfavorable verdict is returned and then complain. Having chosen not to move for a mistrial when the matter first became known and when it appeared the trial judge was favorably disposed to the motion, and having elected to let the jury continue its deliberations in the hope of a verdict of acquittal, appellant cannot now take advantage of this alleged error without showing a strong probability of prejudice.

The State relies on *State v. Murphy,* 91 Ohio St.3d 516, 747 N.E.2d 765 (2001), to support its waiver claim. There, unlike in this case, the defendant was aware that the juror had entered the jury room. The Supreme Court of Ohio held that a complaint regarding the erroneous presence of alternate jurors during deliberations was not preserved. Quoting *State v. Childs,* 14 Ohio St.2d 56, 236 N.E.2d 545, 549 (1968), it said, *id.* at 788:

It follows that the alternates should not have been present in the deliberations.

However, no defense objection appears in the trial record to the presence of the alternate jurors. The waiver rule requires that a party make a contemporaneous objection to alleged trial error in order to preserve that error for appellate review. The rule is of long standing, and it goes to the heart of an adversary system of justice.

Even constitutional rights "may be lost as finally as any others by a failure to assert them at the proper time." *Cf. Brockington, supra,* 176 Md.App. at 359–60, 933 A.2d 426 (suggesting that, in a civil case, a party may be estopped from complaining about the presence of alternate jurors during deliberations if he previously consented to their presence).

In our view, the rationale of the cases cited above is more convincing on the issue of preservation than the North Carolina case of *Bindyke.*

In the context of this case, *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), is also noteworthy. There, the Supreme Court considered the defendants' claim of prejudice because two alternate jurors were permitted to retire with the jury and were present throughout the jury's deliberations, in violation of Rule 24(c) of the Federal Rules of Criminal Procedure ("Fed R.Crim. P."). That rule, like Md. Rule 2–512(b), requires the court to discharge any remaining alternate jurors when the jury retires to deliberate. Unlike in this case, the presence of the alternates was known to the defendants. However, they failed to object. Therefore, the Supreme Court considered the matter under the "plain error" rule set forth in Fed R.Crim. P. 52(b).[6]

The *Olano* Court examined whether the error affected "substantial rights" within the meaning of Fed.R.Crim.P.

---

6. Fed.R.Crim.P. 52(b) provides:
 PLAIN ERROR. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

52(b). It noted that the presence of alternate jurors during jury deliberations has the potential to prejudice a defendant in two ways: (1) either because the alternates actually participated in the deliberations, verbally or through "body language"; or (2) the alternates' presence exerted a "chilling" effect on the regular jurors. *Id.* at 739, 113 S.Ct. 1770. The Court held, however, that the defendants had not met their burden of showing that the error resulted in prejudice. *Id.* at 741, 113 S.Ct. 1770. In particular, it noted that there was no showing that the alternates either participated in or "chilled" the deliberations by the jurors. *Id.* at 739, 113 S.Ct. 1770. Moreover, the Court declined to presume prejudice from the mere presence of alternate jurors, who had been instructed not to participate in the deliberations. *Id.* at 740, 113 S.Ct. 1770. *Cf. Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (reversing a lower court's finding of a presumption of prejudice where, during trial, juror had applied to work in prosecutor's office). *But see Jenkins v. State,* 375 Md. 284, 825 A.2d 1008 (2003) ("agree[ing] that not all incidental contacts between jurors and witnesses are inherently prejudicial," but concluding that "gross violations" in the case "inherently prejudice[d]" appellant, and rejecting State's claim that any presumption of prejudice "was successfully rebutted"). *Id.* at 321, 324, 329, 825 A.2d 1008.

As in *Olano,* courts in other states have recognized that, in the event of waiver, a claim of prejudice arising from the presence of an alternate juror may be reviewed under the plain error doctrine. *See, e.g., State v. Yarbrough,* 104 Ohio St.3d 1, 817 N.E.2d 845, 860 (2004) ("[T]he defense did not object to the alternates' presence during the jury's deliberations and thus waived all but plain error ... Here, there was no plain error."); *McAdams v. State,* 75 P.3d 665, 667 (Wyo. 2003) (noting that defense counsel failed to "object to the alternate juror's presence during the jury's deliberations, and therefore the plain error standard of review applies[.]"); *State v. Brown,* 210 W.Va. 14, 552 S.E.2d 390, 395 (2001) ("When a defendant fails to object to an alternate juror retiring to the jury room with the regular jurors, we will consider the circum-

stances under the plain error rule[.]") Of import here, however, appellant has not asked this Court to review the matter under the plain error doctrine.

 We have concluded that Ramirez's failure to timely move for a mistrial or for a new trial resulted in a waiver of his complaint as to the presence of the alternate juror during jury deliberations. Even if appellant's claims are preserved, however, appellant would fare no better. This is because we are satisfied that the State rebutted any presumption of prejudice arising from the alternate juror's presence in the jury room. We explain.

Pursuant to Maryland Rule 2–512(b), an alternate juror "shall be discharged when the jury retires to consider its verdict." Until that point, the rule permits the substitution of an alternate juror. In *Stokes, supra,* 379 Md. at 638, 843 A.2d 64, the Court said:

We consider the presence of alternate jurors during the jury deliberations as sufficiently impinging upon the defendant's constitutional right to a jury trial as guaranteed by the Maryland Constitution and Maryland Rules of Procedure to create a presumption of prejudice. Jury deliberations are private and are to be conducted in secret. . . . The rule prohibiting verdict impeachment is stringent and of long standing; one reason for the rule is to protect the secrecy of jury deliberations. . . . It has been said that while privacy is not a constitutional end in itself, it is the means of ensuring the integrity of the jury trial itself. . . . The presence of alternate jurors who have no legal standing as jurors injects an improper outside influence on jury deliberations and impairs the integrity of the jury trial. Prejudice must be presumed where alternates breach the sanctity of the jury room.

The application of a presumptive prejudice test is consistent with our prior cases where the type of error involved made it difficult to prove actual prejudice. (Internal citations omitted).

To be sure, the *Stokes* Court recognized that the presumption of prejudice was "effectively unrebuttable under most circumstances," because of the prohibition contained in Rule 5–606 against impeachment of a verdict by a juror. *Id.* at 642, 843 A.2d 64. It admonished that "the presumption of prejudice which arises from the presence of the alternate jurors may not be rebutted by inquiring into the proceedings inside the jury room or into the juror's mental processes or any statements made during the deliberations." *Id.* at 641–642, 843 A.2d 64. But, as we discuss, *infra*, *Stokes* does not absolutely preclude the possibility that the presence of an alternate juror might have been innocuous. And, as the circuit court observed, if a presumption is classified as rebuttable, there must be a procedure by which a court can assess whether it was rebutted.

Here, following an evidentiary hearing, the circuit court found that "deliberations had not as yet begun" when the alternate was present. As we see it, that factual determination is dependent on a legal analysis of when jury deliberations are deemed to commence. We pause to consider the law that applies to such a finding.

*Hayes v. State*, 355 Md. 615, 735 A.2d 1109 (1999), involved the substitution of an alternate juror for a regular juror after the jury had retired to deliberate. After a thorough examination of federal and State cases analyzing the point at which a jury is considered to have retired to deliberate, Judge Wilner wrote for the Court:

> [W]e conclude that an alternate juror who remains qualified to serve may be substituted for a regular juror who is properly discharged, until such time as the jury enters the jury room to consider its verdict and closes the door. *We view the closing of the door as marking the point at which the ability to substitute ends—the effective point at which we consider the jury to have commenced deliberations.* We believe that to be a fair and practical standard that is consistent with the text and the purpose of the rule and that avoids some of the problems inherent in the available alternatives. It is a fair standard in that a defendant is not

prejudiced by a substitution if (1) the jury has not yet entered the jury room to discuss the case, and (2) the alternate juror had not been subjected to any outside influence and remains qualified to serve. *Even after a case is submitted to a jury, in the sense that instructions and closing arguments have been completed, juries are often allowed to defer the commencement of deliberations for some period of time*—until after lunch, until the next morning, or even over a weekend or holiday. Whether the jury has been sequestered or unsequestered, the delay is ordinarily no different, in terms of any prejudice to the defendant, than breaks that occurred during the trial. *Prejudice from a substitution can arise, in terms of time, only when the jurors begin to discuss the case,* and, in terms of the alternate juror, only if that juror, in the meanwhile, has become "contaminated" to the point of no longer being qualified to serve.

*Id.* at 635–36, 735 A.2d 1109 (emphasis added).

The *Hayes* Court added, *id.* at 636–37, 735 A.2d 1109:

It is a practical standard as well because compliance with it can be established through objective and extrinsic evidence, without the need to question jurors as to what went on in the jury room after the door was closed—when deliberations really started. Jurors are ordinarily accompanied to the jury room by a sheriff or bailiff, who can attest to when the door was closed. It is an easily ascertainable event. All that the court need do is to hold the alternate jurors, and not formally discharge them, until the sheriff or bailiff reports back that the jurors have entered the jury room and the door has been closed. That can and should be made a matter of record. If the jury is to be excused for lunch or for the day before commencing deliberations, the court should place alternate jurors under the same instructions and limitations as the regular jurors and direct them to report to the courtroom or otherwise be readily available when the jury is scheduled to return to begin deliberations.

The State posits that the "closing of the door" test announced in *Hayes* is not a "bright line" rule that is dispositive of the issue presented here. It looks to *Stokes* for the proposition that the presumption of prejudice is rebuttable. Further, it contends that the trial court was not clearly erroneous in finding that jury deliberations had not yet begun while the alternate was in the jury room, and in finding the presumption of prejudice was rebutted. In the context of this case, we agree.

The *Stokes* Court recognized that there are circumstances in which the presumption of prejudice can be rebutted. It said: "The presumption may be rebutted, for example, by showing that the alternate juror was not in the jury room after the door was shut ... or where the alternate juror entered the jury room merely to get a coat *and deliberations had not yet begun.*" 379 Md. at 642, 843 A.2d 64 (internal citations omitted) (emphasis added). To illustrate, the Court cited *People v. Rhodes*, 38 Ill.2d 389, 231 N.E.2d 400 (1967), a case in which the presumption of prejudice was successfully rebutted.

*Alston v. State*, 177 Md.App. 1, 934 A.2d 949 (2007), also provides guidance. There, we considered the defendant's claim that the trial court erred in denying his motions for a mistrial and for a new trial "where the jury was not sworn until after the essential conclusion of the State's case[.]" *Id.* at 9, 934 A.2d 949. After discussing the history and purpose of the jury oath, this Court looked to *Stokes* and said, *id.* at 23, 934 A.2d 949:

> An important reason assigned by the [*Stokes*] Court for presuming prejudice from the presence of the alternate jurors was Maryland's longstanding refusal to "inquire into the deliberations and mental processes of the jurors." *Id.* at 642, 843 A.2d 64 (emphasis added). The Court declined to assess the impact of the alternate⁄jurors on the minds and deliberations of the regular jurors, an impact that, like the jury oath, would have required assessment of highly subjective factors.

Notably, *Alston* declined to apply the presumptive prejudice test set forth in *Stokes* to a situation in which the court had belatedly administered the jury oath, opting instead for harmless error review. *Id.* at 27, 934 A.2d 949. Writing for the Court, Judge Adkins reasoned, *id.* at 27, 934 A.2d 949:

> We do not see structural error here. The jury was instructed, before hearing any evidence, that it must listen carefully to the evidence and that its verdict must be based solely on the evidence. It was then sworn before it began deliberations. To conclude that this was structural error would logically mean that we believe that taking the oath is a prerequisite to listening. We do not hold that view.

In this case, the hearing was directed to ascertaining whether deliberations had begun when the alternate was present. There was no inquiry as to internal jury communications among regular jurors, about which the Court was concerned in *Stokes*. Once the evidence was received, the trial court was entitled to assess the credibility of the witnesses. *Binnie v. State*, 321 Md. 572, 580, 583 A.2d 1037 (1991). Based on the evidence, the trial court was entitled to find that the presumption was rebutted.

Although the alternate was in the jury room "after the door was shut," the evidence clearly showed that she was there for just a few minutes, and at a point when actual deliberations had not yet begun. Seabrease did not talk with the jurors and she did not hear any conversation among the regular jurors. During the few minutes of her presence, she put her personal belongings on the table, went to the bathroom, returned, and was promptly confronted by the bailiff, who immediately ushered her out of the jury room.

In our view, the situation below was akin to the example of a circumstance rebutting the presumption that was given by the Court of Appeals in *Stokes*, "where the alternate juror entered the jury room merely to get a coat and deliberations had not yet begun." 379 Md. at 642, 843 A.2d 64; *see Casey, supra*, 809 N.E.2d at 983 ("Where an alternate juror is in the jury room for only a brief period of time . . . prejudice will not

be presumed."); *State v. Broadhead,* 139 Idaho 663, 84 P.3d 599, 604 (App.2004) ("[The alternate] juror had been in the jury room for about five minutes . . . Therefore, any possibility of prejudice would need to arise from the alternate juror being present in deliberations for a short period of time. We do not perceive that prejudice could reasonably arise from this set of facts, where the alternate juror was involved with the jury only for the initial five minutes following the case being submitted to the jury."); *Commonwealth v. Sheehy,* 412 Mass. 235, 588 N.E.2d 10, 12 (1992) ("Minor invasions of the jury's privacy, while regrettable, do not impinge upon the right [to jury trial]"); *Commonwealth v. Saunders,* 20 Mass.App.Ct. 917, 478 N.E.2d 960, 961–62 (1985) (noting that prejudice is not presumed when person entered room to retrieve umbrella and commented that it was raining); *Rhodes, supra,* 231 N.E.2d at 403 (when alternate juror went into jury room to retrieve her coat and was not present during jury deliberations, her presence did not require reversal of defendant's conviction).

▪ Assuming, *arguendo,* that Ramirez is correct in his assertion that the court was not entitled to consider the testimony of the alternate juror, the outcome would be no different. Bailiff Woodburn testified that when he went into the jury room to retrieve the alternate, "Nobody with the jury was seated. They were all in small groups around the table. Nobody was seated at the table." Moreover, he unequivocally stated that "there was no deliberations going on." Before leaving, Woodburn picked up the alternate juror's notebook and removed it from the jury room; he had not seen anyone looking at the notebook. Woodburn estimated that the alternate juror had been present in the jury room for no more than five minutes. The State also presented evidence that, after the removal of the alternate juror, the jury proceeded to deliberate for nearly three hours. Therefore, we agree that the State rebutted any presumption of a "fundamental irregularity of constitutional proportions."

We conclude that the trial court was not clearly erroneous in determining that jury deliberations had not yet begun while the alternate was present, and in finding that the State rebutted the presumption of prejudice.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**