943 A.2d 1272

**Charelles Lamar JONES–HARRIS**

v.

**STATE of Maryland.**

**No. 1855, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

March 13, 2008.

Renee M. Hutchins, Kevin Mattingly, Baltimore, for Appellant.

Steven L. Holcomb (Douglas F. Gansler, Atty. General on the brief), Baltimore, for Appellee.

Panel: HOLLANDER, SALMON and DEBORAH S. EYLER, JJ.

SALMON, Judge.

Charelles Lamar ("Ace") Jones–Harris ("Mr.Harris") was tried and convicted by a jury on July 19, 2006, in the Circuit Court for Washington County, on seven charges: second-degree sex offense (Count 1); second-degree sex offense (Count 2); fourth-degree sex offense (Count 3); fourth-degree sex offense (Count 4); second-degree assault (Count 5); false imprisonment (Count 6); and sodomy (Count 7). He was sentenced to concurrent twenty-year sentences for Counts 1 and 2, and a consecutive ten-year sentence for Count 6. For

purposes of sentencing, Counts 3, 4, and 5 were merged with Counts 1 and 2. Count 7 was merged with Count 6.

Mr. Harris presents four issues for our review:

I. Whether reversal of [his] conviction is required because the trial court failed to strike the medical opinion testimony of a non-expert witness, where the testimony provided the only physical evidence of a sexual assault[.]

II. Whether reversal of [his] conviction is required because the trial court expressly encouraged premature jury deliberations and participation by an alternate juror in the deliberative process[.]

III. Whether [his] ten-year sentence for false imprisonment must be vacated because the State presented no evidence of false imprisonment beyond the restraint intrinsic to the sexual assault[.]

IV. Whether reversal of [his] conviction is required because tactics engaged in by the Assistant State's Attorney during closing statements unfairly prejudiced the jury against [him][.]

## I. *EVIDENCE PRESENTED BY THE STATE*

Jessica Manning ("Jessica") was walking home from a friend's house at approximately "midnight or a little after" on December 31, 2005, when she ran into Shaumorris Robinson ("Mario") and appellant on a street near her home in Hagerstown, Maryland. Jessica considered both men to be friends. She had previously dated Mario for about a month and appellant for a few days.[1] Jessica told the two men [2] that she

---

1. Jessica admitted that she had in the past referred to appellant as "an old boyfriend." She testified, however, that, except for going to the park with appellant "a couple of times" and to McDonald's once, she "didn't do very much of anything with him." In her mind, she did not presently consider her involvement with appellant prior to December 31, 2005, as "dating."

2. Mario was twenty-seven years old; appellant was twenty-three years old.

was turning eighteen that day (December 31). The trio decided to celebrate at Mario's apartment, which he shared with Jennifer Starliper ("Jen"). The apartment was at 660 North Prospect Street in Hagerstown. Jen was home when the three arrived, and a person named "Steven" joined them shortly thereafter. The group all hung out together, drinking alcohol,[3] watching movies, and listening to music.

At one point during the party, Mario observed Jessica rub lotion on appellant's back and either blow or talk into appellant's ear, while the two were sitting together on a loveseat. By 3:15 a.m., Jessica said she had to leave but was unfamiliar with the area. Appellant offered to walk her home, and she accepted the offer.

As they were alone and walking down an alley, Jessica felt a punch to the side of her head. The blow caused her to fall and for her ear to bleed. She asked appellant why he hit her. Appellant denied doing so. Jessica then said, "You're the only one that was here." Appellant next took his sleeve and attempted to wipe off the blood from the side of Jessica's head.

After being hit, Jessica called her father on her cell phone and asked him to pick her up. She could not, however, give an accurate description of where she was located because she was scared and did not know her location. Appellant then carried Jessica into a storage bin and threw her down, causing her to hit her head. Jessica again tried to call her father, but appellant took her phone and threw it away.

While inside the storage bin, appellant forced Jessica to perform fellatio. Jessica had to stop at one point because she began coughing up blood. Appellant then took her head and placed it back on his penis, making her continue to perform that act. When she accidentally bit his penis, appellant picked

---

3. Jessica testified that she was given a cup of Pepsi and vodka but only had a sip. Mario testified, however, that Jessica, although not drinking a lot, nevertheless appeared to be "happy" and "feeling drunk a little bit." On cross-examination, Mario said that Jessica looked "tipsy ... [but] not too tipsy."

her up and threw her across the storage bin, and she hit her head once again. According to Jessica, while in the storage bin, appellant grabbed her and caused her to fall "five or six times."

Appellant also forced Jessica to lean against a wall and drop her pants. When she did so, appellant attempted anal intercourse. He was unable to keep an erection while sodomizing Jessica, and as a result, he forced her to perform oral sex on him again.

Appellant next forced Jessica to submit to anal intercourse once more, causing her to accidentally defecate. At that point, Jessica asked appellant to take her back to Mario's apartment so she could clean up. The following then occurred, according to Jessica's testimony:

[JESSICA:] . . . . He asked me how was I going to hide my face, and I said I could put my hood over my head so I could like hid[e] the marks and stuff on my face. And so we went out of the storage bin, and we were walking down the alleyway, and he asked me to go back with him to get his jacket, and I told him just forget about your jacket, I just want to go to the house and get cleaned up. And so we went to ... Mario's house, and he told me, "You're not gonna tell the police about this are you?" And I said, "No." He's like, "Because I have a record behind me and everything ..."

Q. [PROSECUTOR:] Uh, You can't ... don't talk about that.

A. Sorry.

Q. You basically ... you told him you wouldn't tell the police, correct?

A. Yes.

Jessica arrived back at Mario's apartment about thirty to forty minutes after she and appellant left the first time. Mario and Jen testified that they both observed that Jessica had a black eye and fresh bruising on the side of her face. Jessica was crying and told them that she was raped by appellant.

Mario took Jessica to her parents' home, and her parents were told that Jessica had been sexually assaulted by appellant. Jessica then took a shower and slept in bed with her mother. That afternoon, around 4 p.m., Jessica called the police, who came to her house to investigate. Jessica gave the police her clothes that she was wearing when she was sexually assaulted. Her jeans, t-shirt, and jacket were covered with dirt, and there was feces on her underwear.

Stephen Manning ("Mr.Manning"), the victim's father, testified that Jessica called him in the early morning hours of December 31, 2005; she was upset and in tears, and said, "Daddy, come get me." Mr. Manning then left his house and attempted to find her, but the victim had given him the wrong street address. He returned home and remained there until Mario brought Jessica home. Mr. Manning testified that his daughter looked like she had been punched in the face; her eye was black and her left temple was swollen.

Jessica received treatment at Washington County Hospital on December 31, 2005. After a CAT scan and x-rays were taken, she met with Cynthia Lewis, a SAFE[4] nurse, who conducted a four-hour examination. Ms. Lewis testified that she observed bruises on Jessica's legs and face and noted that the x-rays revealed that Jessica's nose was broken. To ascertain whether there were any lacerations present that were not apparent to the naked eye, Ms. Lewis applied blue toluidine dye to Jessica's anal region. The dye responds to any breaks in the skin, and if there are any lacerations, the dye will

---

4. The initials "SAFE" stand for "sexual assault forensic examiner." The procedure at the Washington County Hospital is as follows: When a patient arrives at the emergency room with a complaint of sexual assault, a SAFE nurse is called in to conduct an examination. Upon meeting with the patient, the SAFE nurse conducts an interview and performs a head-to-toe assessment of the complainant, looking for bruising or lacerations. Photographs are taken with a MedScope, a device used by forensic nurses to magnify images. The nurse also is required to collect evidence, such as hair, semen, and blood, and to provide prophylactic antibiotics if necessary. Additionally, it is the responsibility of a SAFE nurse to testify at any subsequent criminal trial when necessary.

remain on the skin after one tries to wipe it away. During the exam, Ms. Lewis authored a SAFE Report. In her report, she noted that the toluidine dye revealed positive findings that she described as "scattered uptake from 3 to 9 o'clock in the knee chest position," meaning that there were lacerations in Jessica's external anal region. Defense counsel elected not to cross-examine Ms. Lewis.

## II. *EVIDENCE PRESENTED BY DEFENDANT*

Appellant elected not to testify. He called one witness, Karen Hinchee, a Hagerstown police officer who interviewed Jessica when she was at Washington County Hospital on December 31, 2005. Jessica, who was very scared, told Officer Hinchee that she did not immediately go to Mario's apartment with Mario and appellant after she happened to meet them in the early morning hours of December 31, 2005. Instead, she, Mario, and appellant initially went to an unfurnished apartment and drank Smirnoffs.[5] She also told the officer, several times, that she did not "think that she had a lot" of alcohol that night.

## III. *ANALYSIS*

### A. *Cynthia Lewis' Testimony*

Appellant argues that the trial court erred in allowing Ms. Lewis to give "expert opinion testimony" regarding her observation of lacerations in Jessica's anal region, because she was not called as an expert. On the morning of trial, defense counsel made a motion in limine to exclude the SAFE Report, arguing that:

> [The] report, which I believe the State feels would show evidence of there being a sexual assault, ought to be precluded from being introduced or used at trial, because ...

---

5. When Jessica was questioned by appellant's counsel about the oral statement Officer Hinchee recounted, she denied telling the officer that she went with Mario and appellant to an unfurnished apartment prior to going to Mario's apartment.

there's never been any official notice provided that [Ms. Lewis is] an expert in any particular field and can express an expert opinion. And absent that, the language that's in this particular document ... does not contain terms and explanations that are self-evident. It would need somebody to testify as to what that means and why this would indicate a sexual assault. And I don't believe any of that type of expert testimony is available today, and I'll ask the court not to allow the report that the State would like to be introduced at trial through ... Ms. Lewis, to be used. And we'd ask the court not to allow it to be discussed during opening statement either.

The specific language in the SAFE Report that defense counsel objected to was the phrase "scattered uptake." The State indicated that it had a "graphic photograph of uptake of the toluidine dye" that it was prepared to introduce if the court requested. Although the trial judge acknowledged that it was not clear to him what that phrase meant, he assumed it was something that was "simply observable by an examination" and was "not necessarily an opinion."

Defense counsel also said that the main problem that he had with the report was that the State would argue that the term "scattered uptake" signified sexual assault. The prosecutor assured counsel that she would not ask Ms. Lewis, a non-expert, whether the existence of uptake was evidence of sexual assault. The prosecutor's position was that the fact that toluidine dye shows a laceration to the skin was not an opinion.[6] The court agreed with the State and denied defendant's in limine motion.

The SAFE Report was admitted into evidence pursuant to

---

6. At trial, the prosecutor did ask Ms. Lewis if there could be a break in the skin and uptake for consensual sex, to which she responded "that's possible, but where the uptake was on this ... is not probable." Defense counsel then objected and the objection was sustained, and Ms. Lewis' response to that question was stricken by the court. Appellant does not contend in this appeal that the court erred in regard to the handling of the improper question asked by the prosecutor.

Maryland Rule 5–902(a)(4),[7] over defense counsel's objection. Ms. Lewis testified that, at first glance, Jessica's face and knees demonstrated obvious cuts and bruising. After photographing those injuries, Ms. Lewis applied toluidine dye to the victim's anal region to better detect any lacerations that might be present. Once the dye was applied, she wiped it off and observed "scattered uptake" meaning that she saw that there was a laceration. The purpose of the dye was to look for "uptake anywhere there is a break in the integrity of the skin."

Prior to allowing Ms. Lewis to testify concerning the observed lacerations, appellant's counsel objected, and the following colloquy ensued:

THE COURT: Is this something that you can observe?

[MS. LEWIS:] This is something I observe. This is something I was trained to do in my training to become a forensic nurse.

---

7. Rule 5–902(a)(4) reads:

(a) **Generally.** As used in this Rule, "certifies," "certificate," or "certification" means, with respect to a domestic record or public document, a written declaration under oath subject to the penalty of perjury and, with respect to a foreign record or public document, a written declaration signed in a foreign country which, if falsely made, would subject the maker to criminal penalty under the laws of that country. The certificate relating to a foreign record or public document must be accompanied by a final certification as to the genuineness of the signature and official position (1) of the individual executing the certificate or (2) of any foreign official who certifies the genuineness of signature and official position of the executing individual or is the last in a chain of certificates that collectively certify the genuineness of signature and official position of the executing individual. A final certificate may be made by a secretary of an embassy or legation, consul general, consul, vice consul, or consular agent of the United States, or a diplomatic or consular official of the foreign country who is assigned or accredited to the United States. Except as otherwise provided by statute extrinsic evidence of authenticity as a condition precedent to admissability is not required with respect to the following.

\* \* \*

(4) *Certified Copies of Public Records.* A copy of an official record or report or entry therein, or of a document authorized by law to be recorded or filed and actually recorded or filed in a public office, including data compilations, certified as correct by the custodian or other person authorized to make the certification, by certificate complying with this Rule or complying with any applicable statute or these rules.

THE COURT: But is this something you can simply observe with your eyes?

[MS. LEWIS:] Yes.

THE COURT: Overruled.

 Appellant argues that the trial court erred in allowing Ms. Lewis to testify that dye uptake indicated the presence of a laceration, characterizing such a statement as "expert opinion testimony." We disagree. Ms. Lewis' testimony regarding what she saw after applying blue dye to Jessica's anal area was a report of an observation, not an opinion. In the portion of the nurse's testimony to which appellant objected, Ms. Lewis did not testify that, in her opinion, the presence of the laceration was evidence of a sexual assault; instead, she merely stated that after applying the dye and wiping it away, she saw a laceration.

It must be stressed that the issue upon which the trial court ruled was whether the witness was rendering an expert opinion when she testified as to what she saw after the dye was wiped away. As the Court of Appeals made clear in *Dorsey v. Nold*, 362 Md. 241, 251, 765 A.2d 79 (2001), a medical care provider does not testify as an expert when his or her testimony is limited to what the provider did and what he or she observed while treating the patient. While Ms. Lewis indisputably had medical knowledge far superior to that of a layperson, the objected to testimony did not call for the expression of an opinion by her. This distinguishes this case from *Ragland v. State*, 385 Md. 706, 725, 870 A.2d 609 (2005), where the Court held that "opinions or inferences that rely on scientific, technical or specialized knowledge must be excluded unless the witness is qualified as an expert."

Ms. Lewis testified that when she trained to become a forensic nurse she was taught how to *use* toluidine dye. That testimony plainly did not mean that in the absence of such training she would be unable to *observe* the dye uptake after she wiped away portions of the dye. Appellant acknowledges that a lay witness may be able to observe dye uptake but asserts that it takes specialized training to arrive at the

conclusion that dye uptake suggested a break in the skin. We once again disagree. As the prosecutor pointed out to the court, Ms. Lewis testified that, when toluidine dye is applied to the skin and wiped off, if there is any break in the skin, the dye will adhere to the injury site, making it easier to visualize. She could see the laceration as could any person with normal vision. To prove this last point, the State offered to introduce a picture demonstrating the break in the skin observed after the dye uptake.

The result of the dye uptake was simply to enhance what the human eye can perceive. Reporting what can be seen after dye has been applied and wiped away is no more an expression of an opinion than a witness testifying as to what he could see when using night vision goggles or an eye doctor who testifies that he could see a scratch of the cornea once he put colored drops in the eye to make clear what otherwise could not be seen. The trial court did not err in admitting the objected to evidence.

### B. *Jury Instructions*

The Maryland Pattern Jury Instruction for criminal cases dealing with discretionary preliminary instructions reads in relevant part:

> During the trial and during any recess, do not express any opinion about the case. Do not even discuss the case, either among yourselves or with any other person. Do not allow yourself to overhear anyone discussing the case. . . . You must base your decision only on the evidence presented in this courtroom. Keep an open mind throughout the trial.

MPJI–Cr 1:00: Pretrial Introductory Instruction.

The trial court gave two improper instructions to the jury during the trial. The first instruction at issue was given immediately after the jury was sworn. The trial judge said:

> You're not to discuss this case amongst yourselves or with anyone else *until and unless all of you are assembled in the jury room together. So when all thirteen of you are in the*

*jury room together, that is the only time that you can speak about the case.*

(Emphasis added.)

The second improper instruction was given immediately prior to the one hour and fifteen minute lunch recess, when the judge said: "You're not even going to talk about the case until and unless *all thirteen of you are assembled in the jury room together.*" (Emphasis added.) Neither instruction was objected to by appellant's trial counsel.

Maryland Rule 4–325(e) reads:

**Objection.** No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the jury. An appellate court, on its own initiative or on the suggestion of a party, may however take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object.

In *Walker v. State,* 343 Md. 629, 645, 684 A.2d 429 (1996), the Court said:

Maryland Rule 4–325(e), as well as a multitude of cases in this Court, make it clear that the failure to object to a jury instruction ordinarily constitutes a waiver of any later claim that the instruction was erroneous. *See, e.g., Bowman v. State,* 337 Md. 65, 67, 650 A.2d 954 (1994) ("review of a jury instruction will not ordinarily be permitted unless the appellant has objected seasonably so as to allow the trial judge an opportunity to correct the deficiency before the jury retires to deliberate"); *Ayers v. State,* 335 Md. 602, 627–628, 645 A.2d 22 (1994), *cert. denied,* [513] U.S. [1130], 115 S.Ct. 942, 130 L.Ed.2d 886 (1995) ("a party who fails to object to a jury instruction at trial may not later raise the issue"); *Baker v. State,* 332 Md. 542, 563, 632 A.2d 783 (1993), *cert. denied,* 511 U.S. 1078, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994); *Collins v. State,* 318 Md. 269, 284, 568 A.2d 1, *cert.*

*denied,* 497 U.S. 1032, 110 S.Ct. 3296, 111 L.Ed.2d 805 (1990) ("Counsel's failure to except to the reinstruction is indicative of an acceptance.... Under these circumstances, defense counsel has failed to preserve the challenge to the court's instructions"); *Johnson v. State,* 310 Md. 681, 685–689, 531 A.2d 675 (1987).

Appellant asserts that we should entertain the question as to whether the above two jury instructions warrant reversal. According to appellant, giving the instructions constituted "plain error."

Appellant argues:

Here, the trial court's instruction to the jury that they could discuss the case whenever they were assembled in the jury room grossly undercut Mr. Jones–Harris' ability to receive a fair and impartial trial and was even more egregious than the plain error found in *Garrett [v. State,* 394 Md. 217, 905 A.2d 334 (2006) ]. First, the ability of the jury to deliberate prematurely meant that the jurors may have begun deliberating after hearing only some of the State's evidence, during one of the numerous recesses taken before the defense's case. From that point on, a juror may have selectively heard only what evidence from Mr. Jones–Harris' case that reinforced his or her preliminary inclinations. Second, as stated above, the presence of the alternate juror during the premature discussions in the jury room suggests that Mr. Jones–Harris' jury consisted actually of thirteen members, which is unconstitutional in the State of Maryland. Finally, in cases where the potential for premature deliberations is combined with the outside influence of an alternate juror's presence, prejudice is presumed. The fact that a case with such serious charges against the defendant merited less than an hour of deliberation is highly suggestive that the jury had been deliberating throughout the trial.

Because an alternate was allowed to participate in jury deliberations, in contradiction of the Court of Appeals' holding in *Stokes [v. State,* 379 Md. 618, 843 A.2d 64 (2004) ], prejudice resulting from the erroneous jury instruction

must be presumed and his conviction must be reversed under the "plain error" doctrine.

We agree with appellant that the trial judge erred when he gave the two instructions about which appellant complains. While it is not required, "constitutionally, or by statute, rule or decision," that a court instruct the jury at the beginning of a trial not to discuss the case until they are sent back to the jury room to reach a verdict, it is nevertheless a beneficial practice that serves to preclude any possibility of juror misconduct. *Wilson v. State*, 4 Md.App. 192, 200–01, 242 A.2d 194 (1968). "The purpose of admonishing the jury not to discuss the case among themselves during trial is to avoid having the jurors form opinions regarding the verdict before they have heard all of the evidence in the case." *Summers v. State*, 152 Md.App. 362, 379, 831 A.2d 1134 (2003).

This general rule was enunciated almost fifty years ago in *Midgett v. State*, 223 Md. 282, 293, 164 A.2d 526 (1960), when the Court said:

It is, however, our established practice that an admonition be given by the trial court to the members of the jury, prior to their separation, against discussing the case with others or among themselves. Unquestionably, such a specific admonition would have been given, if requested, just as the trial judge of his own motion gave such an admonition on several occasions.

The State, relying on *Wilson v. State, supra,* contends that it was not "error" for the court to give the two instructions at issue. We disagree. In *Wilson*, the trial judge told the jury immediately before each of seven separations that it was not to discuss the case unless all jurors were together in the jury room. 4 Md.App. at 195, 242 A.2d 194. After the first admonition, defense counsel objected, arguing that the jury should be told that it was not to discuss the case until the end of trial when the case is sent to it. *Id.* The trial court disagreed, reasoning that it was not practical to think the jury would not discuss the case during a recess and, so long as the jury is instructed not to take a vote or make any final

determination, it was permissible to give the instruction it did. *Id.* at 195–96, 242 A.2d 194.

After Wilson was convicted, he appealed and argued that "before the case is finally submitted to the jury, [jurors] may not properly discuss it among themselves whether or not they are separated and therefore, the trial judge committed prejudicial error." *Id.* at 196, 242 A.2d 194. This Court rejected that argument, noting that we "[did] not agree that it necessarily follows that an accused is denied a fair trial and due process of law because of the absence of an admonition not to discuss the case before its final submission to them or because *they are told, in effect, that they may so discuss it.*" *Id.* at 198, 242 A.2d 194 (emphasis added). Because there was "no hint or suggestion that the verdict of the jury was not based solely on the evidence and the whole of the evidence or that the jurors committed their minds until all the evidence was presented to them" we held that the defendant was not prejudiced by the trial court's instruction to the jury. *Id.* at 199–200, 242 A.2d 194.

As noted, in this case the trial judge told the jury, before any witnesses were called, that they were not to discuss the case unless all *thirteen* were together in the jury room. After receiving this instruction, but before any evidence was presented, the court had a short recess and instructed the jury to retire to the jury room. All told, prior to being sent back to reach a verdict, there were three recesses, including the luncheon recess, where the twelve jurors, plus the alternate, were left alone in the jury room after they had heard evidence. At the close of all the evidence at appellant's one-day trial, and after hearing closing arguments and receiving instructions, the alternate juror was excused, and the remaining twelve jurors were sent back into the jury room to deliberate.

This case is not controlled by *Wilson,* because here the court said, in effect, that the jurors and the alternate could discuss the case prior to hearing all the evidence. The Court of Appeals has recognized that alternate jurors "clearly are different than regular jurors ... and, in a sense, their status

is that of a third party." *Stokes v. State,* 379 Md. 618, 633, 843 A.2d 64 (2004) (citing *Commonwealth v. Smith,* 403 Mass. 489, 531 N.E.2d 556, 559 (1988)) ("alternate jurors, as long as they remain alternates, really are not jurors"). The *Stokes* Court explained that the presence of alternate jurors during the jury deliberations is considered by the Court of Appeals "as sufficiently impinging upon [a] defendant's constitutional right to a jury trial as guaranteed by the Maryland Constitution and Maryland Rules of Procedure to create a presumption of prejudice." *Id.* at 638, 843 A.2d 64. The participation of an alternate not only "breach[es] the sanctity and privacy of the jury deliberations" but results in the alternate lacking any accountability for his participation. *Id.* at 634, 843 A.2d 64 (reasoning that "[a]n alternate juror, as an unauthorized individual, is not committed to the decision and is not faced with the ultimate and weighty responsibility to decide the case").

As noted *supra,* appellant relies heavily on *Stokes* to support his claim that we should reverse his conviction based on unpreserved error. In *Stokes,* the defendant entered a plea of "not criminally responsible," and the trial judge, during the guilt/innocence phase of the trial, retained four alternate jurors and permitted them to participate in jury deliberations.[8] *Id.* at 623, 843 A.2d 64. The jury was initially instructed by the court that all sixteen of the jurors needed to be unanimous when reaching a verdict. *Id.* At some point after the case was submitted to the jury and deliberations had begun, the trial court realized that the alternate jurors should not have been permitted to partake in deliberations. *Id.* at 623–24, 843 A.2d 64. Over objection by defense counsel, the trial court instructed the jury that the alternate jurors could remain in the jury room, yet could not participate while the twelve jurors reached a verdict. *Id.* at 625, 843 A.2d 64. In reversing the defendant's conviction, the *Stokes* Court noted that "[t]he presence of alternate jurors who have no legal standing

---

**8.** The Court of Appeals in *Stokes* recognized that the question of preservation for appellate review was not an issue because defense counsel timely objected to the presence of alternate jurors in the jury room. *Stokes,* 379 Md. at 639 n. 10, 843 A.2d 64.

as jurors injects an improper influence on jury deliberations and impairs the integrity of the jury trial. Prejudice must be presumed where alternates breach the sanctity of the jury room." *Id.* at 638, 843 A.2d 64.

Appellant argues that here, as in *Stokes,* the presence of the alternate juror during "deliberations" in this case requires this Court to recognize "plain error" and reverse his conviction. Contrary to appellant's argument, *Stokes* is not dispositive.

In this case, because appellant's counsel never objected at trial or asked the judge to question the venireperson as to what, if anything, had been discussed, we have no way of knowing whether any juror discussed the case in the presence of an alternate juror. All we do know is that the alternate juror *was not* present "when the jury retire[d] to consider its verdict." *Stokes,* 379 Md. at 636, 843 A.2d 64 (quoting *Hayes v. State,* 355 Md. 615, 635, 735 A.2d 1109 (1999)). This is important because it is only when the door closes for jury deliberation that prejudice is presumed.

In *Stokes,* one of the major issues was: At what point can an alternate juror be substituted for a regular juror. The *Stokes* Court said:

> We had the occasion in *Hayes v. State,* 355 Md. 615, 735 A.2d 1109 (1999), to consider whether an alternate juror may be substituted for a regular juror after the alternate juror had been excused and after the jury had begun deliberations. Judge Wilner, writing for the Court, discussed the history of the use of alternate jurors in Maryland as well as in federal and other state courts. At issue was the meaning of *"when the jury retires to consider its verdict,"* contained in Rule 4–312(b)(3). We concluded as follows:
>
>> "[A]n alternate juror who remains qualified to serve may be substituted for a regular juror who is properly discharged, *until such time as the jury enters the jury room to consider its verdict and closes the door.* We view the closing of the door as marking the point at which the

ability to substitute ends—*the effective point at which we consider the jury to have commenced deliberations.*"

*Id.* at 635, 843 A.2d 64. *Once the door has closed, prejudice to the defendant is presumed and reversal is required.* In so holding, we rejected "the Federal approach of circumventing the rule through an expansive harmless error or presumptive non-prejudice doctrine that is entirely foreign to our jurisprudence." *Id.* The standard we adopted in *Hayes* we deemed to be a practical one, "because compliance with it can be established through objective and extrinsic evidence, without the need to question jurors as to what went on in the jury room after the door was closed—when deliberations really started." *Id.* at 636, 735 A.2d 1109.

\* \* \*

The presence of alternate jurors during deliberations creates a presumption of prejudice that is effectively unrebuttable under most circumstances. The presumption may be rebutted, for example, by showing that the alternate juror was not in the jury room after the door was shut, *see Hayes,* 355 Md. 615, 735 A.2d 1109, or where the alternate juror entered the jury room merely to get a coat and deliberations had not yet begun, *see People v. Rhodes,* 38 Ill.2d 389, 231 N.E.2d 400 (1967) (where alternate juror went into the jury room to get her coat and was not present during jury deliberations, her presence did not require reversal of defendant's conviction).

*Id.* at 636–37, 642, 843 A.2d 64 (footnote omitted) (emphasis added).[9]

---

9. We recently held that, even after the "door has shut" and the jury has retired to consider its verdict with an alternate juror present, the presumption of prejudice may nevertheless be rebutted by showing that the alternate was removed prior to the start of any actual deliberation among the jurors. *Ramirez v. State,* 178 Md.App. 257, 287, 941 A.2d 1141 (2008).

█ To summarize, the point at which the jury is considered to have "commenced deliberations" so that prejudice can be presumed is at "such time as the jury enters the jury room *to consider its verdict* and closes the door." *Id.* at 636, 843 A.2d 64 (emphasis added). We would have to engage in the rawest form of speculation to conclude that the alternative juror ever deliberated or even discussed the case with the regular jurors. No such speculation would have been necessary if appellant had objected at a point when the trial court's error could have been corrected.

As shown from the excerpt from appellant's brief, quoted *supra,* appellant contends that the unobjected to error in this case was "more egregious" then the error at issue in *Garrett v. State,* 394 Md. 217, 905 A.2d 334 (2006). In *Garrett,* the Court of Appeals ruled that a panel of this court abused its discretion in failing to recognize plain error. *Id.* at 224, 905 A.2d 334.

█ In *Garrett,* the error committed by the trial judge occurred when it instructed the jury that the defendant could be convicted of attempted first-degree murder based on the doctrine of transferred intent. *Id.* at 225, 905 A.2d 334. In *Harrison v. State,* 382 Md. 477, 506–08, 855 A.2d 1220 (2004), the Court of Appeals had previously held that the doctrine of transferred intent did not apply to attempted murder of an unintended victim. In *Garrett,* a panel of this Court in an unreported decision, acknowledged that transferred intent was not the correct theory but refused to recognize plain error because the defendant *could* have been convicted under the legal theory of concurrent intent—even though the jury was not instructed as to that theory. 394 Md. at 225, 905 A.2d 334. Another panel of this Court, in *Brady v. State* (an unreported opinion), construing similar facts to those set forth in *Garrett,* recognized plain error and reversed Brady's conviction. *Id.* The Court in *Garrett* held that we had abused our discretion in failing to recognize plain error. *Id.* at 226–27, 905 A.2d 334.

We disagree with appellant's argument that the error by the trial judge in this case was as egregious as that in *Garrett.* In

*Garrett,* the jurors were told that they could convict appellant of two serious crimes on a theory that was inapplicable. The jury then proceeded to convict Garret of those two crimes. The Court of Appeals has previously held that a defendant is prejudiced when the court inaccurately supplies or omits in a jury instruction an element of a charged offense. *State v. Brady,* 393 Md. 502, 509–10, 903 A.2d 870 (2006).

In this case, as noted earlier, it is completely speculative as to whether the jurors ever discussed the case prior to the discharge of the alternate.

Research has been conducted by the National Center for State Courts into the issue of whether pre-deliberation discussions are actually prejudicial:

From June 1997 to January 1998, researchers from the National Center for State Courts (NCSC), in cooperation with the Arizona Supreme Court, conducted a field experiment on pre-deliberation discussions in civil jury trials in the superior courts of four Arizona counties. In this six-month study, trials were randomly assigned a "Trial Discussions" designation, signifying a trial in which jurors were instructed that they could discuss the evidence before final deliberations, or a "No Discussions" designation, signifying a trial in which pre-deliberation discussions were prohibited. Pre-deliberation discussion juries were advised that they could only discuss the evidence in the jury room and only when all of the other jurors were present. After every trial, questionnaires asking for a variety of information about the case were distributed to jurors, judges, attorneys, and litigants. Approximately 160 civil trials were studied. Based on an evaluation of the results of the questionnaires, the researchers offered the following findings about pre-deliberation discussions among jurors.

*First, the researchers found that many of the juries that were permitted to discuss the case before deliberations did not. This result was related to the length and complexity of the cases. "Jurors in short, uncomplicated trials were less*

*likely to discuss the evidence during the trial" than were jurors in complex, lengthier cases.*

Second, the researchers found that "to a much greater degree than previous[ly] estimate[d]," jurors from both groups violated the judge's pretrial admonition not to have informal discussions with other jurors or to discuss the case with family or friends. Nonetheless, jurors in the Trial Discussions group were "less likely to talk about the evidence with family and friends than jurors [in the No Discussions group], which suggests that being allowed to discuss the evidence provides an outlet that reduces the need to discuss the case with family and friends."

Third, the researchers found that the vast majority of both judges and jurors who supported the pre-deliberation discussions reform believed that the discussions improved juror comprehension and thought that the discussions did not encourage premature judgments about the evidence. About half of the lawyers and litigants did not support the reform, but agreed that juror discussions improved juror comprehension. The majority of them, however, felt that the pre-deliberation discussions would encourage premature decision-making.

Fourth, the researchers "found no clear evidence that jurors who [were] permitted to discuss the evidence with one another before final deliberations reach[ed] conclusions about the evidence earlier than jurors who [were] prohibited from discussing the evidence." "Contrary to fears that trial discussions might solidify early opinions, jurors assigned to the Trial Discussions group reported that they changed their minds just as often as those assigned to the No Discussions group."

\* \* \*

Finally, the researchers found "no evidence of greater cohesiveness among jurors who discussed the evidence during the trial."

In view of these findings, the researchers arrived at three conclusions. First, pre-deliberation discussions among jurors did not appear to lead to premature judgments about the evidence and the verdict. Second, such discussions may

aid juror comprehension. And third, such discussions may reduce a juror's· need to discuss the case with non-jurors. The researchers offered this summary:

Discussions about the evidence during civil jury trials did not appear to lead to prejudgment or prejudice, at least to the extent we were able to measure in our study. Nor did we detect dramatic improvements in jury decision-making across cases that affected jury verdicts. Nevertheless, if the jurors' own reports are to be believed, this technique may be quite helpful to jurors both for understanding the evidence and as an appropriate outlet for jurors' thoughts and questions that might otherwise be discussed with family or friends.

David A. Anderson, *Let Jurors Talk: Authorizing Pre–Deliberation Discussion of the Evidence During Trial,* 174 Mil. L.Rev. 92, 113–116 (2002) (footnotes omitted) (emphasis added).

It is true, as appellant stresses, that the error here was plain. But besides being "plain" the error must also be reversible to even reach the threshold requirement for recognizing plain error. *Martin v. State,* 165 Md.App. 189, 196, 885 A.2d 339 (2005). And even if the error, if preserved, was reversible error we will " ' "take cognizance of unobjected to error [only when it is] compelling, extraordinary, exceptional or fundamental to assure the defendant of [a] fair trial." ' " *Rubin v. State,* 325 Md. 552, 588, 602 A.2d 677 (1992) (quoting *Trimble v. State,* 300 Md. 387, 397, 478 A.2d 1143 (1984) (quoting *State v. Hutchinson,* 287 Md. 198, 203, 411 A.2d 1035 (1980))).

The case at hand was short and uncomplicated. Under such circumstances we do not believe that there was any meaningful likelihood that the error deprived appellant of a fair trial.

For the above reason, we decline to take cognizance of "plain error" in regard to the preliminary instructions given by the court.[10] See *Morris v. State,* 153 Md.App. 480, 501–13,

---

**10.** The fact that it took 59 minutes for the jury to return with a guilty verdict on seven counts does not indicate that the jurors had already

837 A.2d 248 (2003), for a full explanation as to the extraordinary circumstances that must be present for an appellate court to recognize unpreserved error. See also *United States v. Olano*, 507 U.S. 725, 737, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), where the Supreme Court recognized that, although it was "plain error" to permit alternate jurors to remain in the jury room when the jury retired to consider its verdict, defendant failed to make a specific showing of prejudice and, therefore, reversal was not warranted.[11]

## C. *Merger*

Appellant was sentenced to twenty years for the two second-degree sexual offenses, with a consecutive sentence of ten years for false imprisonment. Appellant argues that the trial court's failure to merge the sentence for false imprisonment into the sentence for the second-degree sexual offenses was erroneous "because the facts supporting the false imprisonment claim were part and parcel of the evidence underlying the sexual assault conviction."

---

decided appellant's guilt prior to the conclusion of the trial. The relatively short length of deliberation, instead, can easily be explained by the fact that the State produced strong evidence of appellant's guilt and there was almost no contrary evidence for the jury to weigh.

11. We recognize that the Court of Appeals in *Hayes v. State*, 355 Md. 615, 735 A.2d 1109 (1999), rejected the Supreme Court's presumptive non-prejudice test announced in *Olano*, and instead, held that prejudice was presumed when an alternate juror was substituted for a regular juror after deliberations had begun, which is a violation of Maryland Rule 4–312(b)(3) (formerly Rule 4–312(f)(3)). In rejecting the *Olano* standard, the *Hayes* Court reasoned: "We are not liberty, in a decisional context, to change the language of Rule 4–312(b)(3), and we refuse to embark on the Federal approach of circumventing the rule through an expansive harmless error or presumptive non-prejudice doctrine that is entirely foreign to our jurisprudence." *Hayes*, 355 Md. at 635, 735 A.2d 1109.

*Hayes*, however, did not involve plain error review, because the defendant in that case properly preserved his objection to the alternate juror substitution. *Id.* at 637, 735 A.2d 1109. Cases involving the presence of alternate jurors during jury deliberations since *Hayes* have likewise not been the subject of plain error review. *See, e.g., Stokes*, 379 Md. at 632 n. 8; *Ramirez*, 178 Md.App. at 287, 941 A.2d 1141.

 "The doctrine of merger of offenses for sentencing purposes is premised in part on the Double Jeopardy Clause of the Fifth Amendment of the U.S. Constitution, applicable to state court proceedings via the Fourteenth Amendment." *Abeokuto v. State*, 391 Md. 289, 352–53, 893 A.2d 1018 (2006) (citing *Dixon v. State*, 364 Md. 209, 236, 772 A.2d 283 (2001)). We employ the "required evidence test" to determine whether the doctrine applies to a particular case. *Id.* at 353, 893 A.2d 1018 (citing *McGrath v. State*, 356 Md. 20, 23, 736 A.2d 1067 (1999)).

> "The required evidence test focuses upon the elements of each offense; if all of the elements of one offense are included in the other offense, so that only the latter offense contains a distinct element or distinct elements, the former merges into the latter. Stated another way, the required evidence is that which is minimally necessary to secure a conviction for each [ ] offense. If each offense requires proof of a fact which the other does not, or in other words, if each offense contains an element which the other does not, there is no merger under the required evidence test even though both offenses are based upon the same act or acts. But, where only one offense requires proof of an additional fact, so that all elements of one offense are present in the other, and where both offenses are based on the same act or acts, [ ] merger follows [ ]."

*Id.* (quoting *McGrath*, 356 Md. at 23–24, 736 A.2d 1067). "When a merger is required, separate sentences are normally precluded; instead, a sentence may be imposed only for the offense having the additional element or elements." *Id.*

 Appellant was convicted for two second-degree sexual offenses: the first for the act of fellatio and the second for the act of anal intercourse. To prove these offenses, the State was required to show that (1) appellant committed both sexual acts with Jessica; (2) the acts were committed by force or threat of force; and (3) the acts were committed without Jessica's consent.

■■■ "False imprisonment, a common law offense, is the 'unlawful detention of another person against his [or her] will.'" *Marquardt v. State*, 164 Md.App. 95, 129, 882 A.2d 900 (2005) (citing *Midgett v. State*, 216 Md. 26, 39, 139 A.2d 209 (1958)). To obtain a conviction for false imprisonment, the State was required to prove: (1) that appellant confined or detained Jessica; (2) that Jessica was confined or detained against her will; and (3) that the confinement or detention was accomplished by force, threat of force, or deception.

In support of his argument that the doctrine of merger applies, appellant relies on *Hawkins v. State*, 34 Md.App. 82, 366 A.2d 421 (1976). In *Hawkins*, the defendant approached the victim, engaged her in a brief conversation, and then seized her by the throat and pointed a gun at her. *Id.* at 83, 366 A.2d 421. The victim was ordered to disrobe and lie on the ground. After the victim complied, the defendant then proceeded to rape her. *Id.* Defendant was convicted of both false imprisonment and rape. The trial court refused to merge the two convictions for purposes of sentencing. On appeal, we held that the trial court erred in failing to merge the offenses, reasoning that "[t]o hold otherwise would be to hold that in every case of rape, a conviction for false imprisonment would also be proper." *Id.* at 92, 366 A.2d 421. We noted, however, that "confinement after or before the rape is committed would preclude the merger." *Id.*

The State argues that the doctrine of merger does not apply here because there was sufficient evidence presented below to demonstrate that Jessica was falsely imprisoned prior to the sexual assaults. The facts of the instant case, the State contends, are similar to those present in *Paz v. State*, 125 Md.App. 729, 726 A.2d 880 (1999). In *Paz*, this Court affirmed defendant's convictions for attempted rape and false imprisonment, holding that the doctrine of merger did not apply.[12] Defendant in *Paz* grabbed the victim around the

---

12. The defendant in *Paz* was convicted of kidnaping; therefore, the false imprisonment conviction was merged into the kidnaping conviction for sentencing purposes. The kidnaping conviction was reversed

neck and dragged her between twenty and twenty-five feet into a dark alley. *Id.* at 734, 726 A.2d 880. Two police officers who witnessed defendant's actions approached him and observed that he was holding a small knife to the victim's neck and face. *Id.* at 735, 726 A.2d 880.

The facts in this case, unlike those in *Hawkins,* show that Jessica was not detained only for the time sufficient to accomplish the sexual assaults. And, the charge of false imprisonment was supported by facts independent of the facts supporting the two charges of second-degree sexual offense. According to the victim, as soon as appellant punched her in the face, she felt that she could not leave.[13] Appellant next picked her up, carried her to the bin, and then threw her into that bin. While the two were in the storage bin, appellant prevented Jessica from speaking with her father by throwing her phone away. Moreover, while in the bin, appellant threw Jessica around in the bin five to six separate times. Proof that appellant committed those acts was sufficient to support the charge of false imprisonment. As in *Paz,* the facts necessary to prove that appellant was guilty of second-degree sexual offense were not sufficient to convict him of false imprisonment. *Moore v. State,* 23 Md.App. 540, 548, 329 A.2d 48 (1974) (" 'The true test of merger under the modern doctrine is whether one crime necessarily involves the other,

---

on appeal, however, because we held that the kidnaping conviction merged into the attempted rape conviction. There was sufficient evidence, however, to sentence defendant separately for false imprisonment and attempted rape.

13. At trial, Jessica testified that as soon as appellant punched her in the face she fell down, and she was too frightened to run away:

[THE STATE]: After he hit you, did you continue to walk with him?
[JESSICA]: No, because we were just standing in the alleyway, and I was trying my hardest just to tell him that I had to go home and my parents would be worried, just, so I could just leave and go. And I was trying to get away from him, he was just standing there, and I wanted to try to get away from him, and I was, kept on walking like on the side so he wouldn't notice what I would be doing. And I was trying to get away from him as much as I could, but I was afraid if I was gonna run because I didn't know if he had a knife or a gun with him.

viz., when the facts necessary to prove the lesser offense are essential ingredients in establishing the greater offense, the lesser offense is merged into the greater offense.'") (quoting *Stewart v. State*, 4 Md.App. 565, 569, 244 A.2d 452 (1968)). Accordingly, we hold that the court did not err in failing to merge the sentences.

### D. *Prosecutor's Initial Closing Argument*

 Appellant contends that three statements made by the prosecutor during closing argument were improper and warrant reversal.

During her initial closing argument, the prosecutor said:

In a long case such as this, although I am pretty happy that we finished in one day, *it's sometimes helpful to first look at the facts that everyone, everyone agrees upon.* And these are those facts, that Jessica goes out on the eve of her eighteenth birthday and she runs into Mario and [appellant] on the street, and that eventually Jessica and Mario and [appellant] wind up at Mario's apartment where Jen Starliper also lives. And then, at some point, Jessica leaves with [appellant]. When Jessica comes back, she's with [appellant] and there's bruising on her face, that no one was alone with Jessica but [appellant], and that man right there (indicating) is [appellant]. And we also know that Jessica endured four hours of an examination with a SAFE nurse, not to mention how long she was with other physicians in Washington County Hospital when they determined that in fact she has a fracture on her face from the punch that was sustained. *Now these are facts that we all agree on. There's medical evidence that you will receive that talks about the fracture to her face. There's medical evidence that you will receive that details the SAFE exam that Cindy Lewis explained to you. Facts, no dispute.*

(Emphasis added.)

After the prosecutor finished her initial closing argument, appellant's counsel voiced no objections to the portion of the argument just quoted or to any other words spoken by the

prosecutor during her initial closing argument. Appellant now argues that the comments were objectionable because

neither Mr. Jones–Harris nor defense counsel had stipulated to the truth of the facts presented by the State's witnesses, and the Assistant State's Attorney's remarks impermissibly led the jury to believe that evidence not directly disputed must be true. This is not the case; it is the responsibility of the jury to judge the credibility of all the witnesses. *Spain [v. State]*, 386 Md. [145,] 153, 872 A.2d 25 [ (2005) ].

This argument is waived because the improper argument alleged was not brought to the attention of the trial judge either when the argument was made or immediately after the prosecutor's initial argument was completed. *See Greater Metro. Orthopaedics v. Ward*, 147 Md.App. 686, 697–98, 810 A.2d 534 (2002); *Grier v. State*, 116 Md.App. 534, 545, 698 A.2d 1133 (1997), *rev'd on other grounds*, 351 Md. 241, 718 A.2d 211 (1998); *Curry v. State*, 54 Md.App. 250, 256, 458 A.2d 474 (1983).

 Even if appellant had timely objected, the objection should have been overruled. The prosecutor did not suggest that appellant stipulated to anything, and the jurors were clearly instructed that it was their job to determine the credibility of the witnesses. Read objectively, the point the prosecutor made was that, based on what occurred at trial, there did not appear to be any dispute as to the facts which she then proceeded to mention. When defense counsel made his closing argument, he did not take issue as to any fact that the prosecutor said were undisputed—except for one: defense counsel said that the victim's broken nose might have resulted from Jessica's having stumbled due to her state of intoxication. Under such circumstances, we fail to see how the prosecutor's remarks were either improper or unfairly prejudicial.

### E. *The State's Rebuttal Argument*

 The two other arguments that appellant claims were improper occurred during the prosecutor's rebuttal argument.

Before discussing those arguments, it is useful to review what argument the prosecutor was rebutting.

In defense counsel's closing argument, he sought to discredit the victim. In characterizing Jessica's activities on the evening of December 30 and early morning hours of December 31, 2005, defense counsel said "it sounds like 'Girls Gone Wild,'" which was a reference to a soft porn video series of that name, which shows young inebriated women engaging in heterosexual and bisexual acts and exposing almost every conceivable anatomical part. He then said:

> What did she do? [Jessica] went out to have some drinks *with a couple of older black guys, men in their twenties,* former boyfriends, late at night, didn't tell her parents where she was going, . . . stays out for an incredibly long time till [sic] 3:15 in the morning. . . . She went out to get drunk and party. And maybe . . . at some point she got so drunk, she was intoxicated, maybe something happened, but not what she described.

Later, defense counsel argued:

> [W]hen you're making your decision, keep in mind this young girl doesn't want to be truthful because to this day *she doesn't want her parents to know what she did.* Perhaps it's not likely that a young woman on her 18th birthday is real proud to tell her parents that *she decided to fool around with some older black males* [Jessica is Caucasian] in an apartment after getting drunk on the night of her birthday. Maybe that's not a very easy thing to do. And maybe while you saw her crying from the stand today and being very upset, maybe it's very difficult to not cry recognizing, number one, it's a very stressful situation for someone who's not used to talking in public to tell you folks anything, but to falsely accuse somebody from the stand, sticking with a lie that took on a life of its own. She said it back then and now she's stuck with it and has to come up with ever more detailed explanations to explain away what she did, what happened, and why. That's what you have to keep in mind. . . .

\* \* \*

... Now when you're trying to decide whether or not this is somebody who, ... as the State has said, presented evidence, you know, *through other witnesses saying that she claims she was a virgin and that this is not a situation of somebody who went out to have a good time and perhaps went in over her head and did things that she now regrets consensually, you have to look at a time when she's at the hospital and she's claiming at that point, "Oh, there's been a sexual assault."* They tried to collect evidence to determine, well, for instance, is there any semen? Is there any other DNA evidence? Anything from her, and they went to collect hair samples, and of course they couldn't do that. It says so right on the report because it says there was no pubic hair. It had all been shaved. *She refused to allow there to be any kind of vaginal examination.* And that's an odd thing, isn't it? [14] Because maybe she doesn't want her parents to know she's had vaginal sex, so she refuses that kind of examination. Perhaps when it came to anal sex, she decided that's not something that she was very happy with, and that's what she said examine [sic], but she didn't want ..., she didn't allow them to even look. Perhaps they would have found had they done that, that perhaps there was consensual intercourse, and she didn't want anyone to know about that.

(Emphasis added.)

The prosecutor, in her rebuttal argument, said:

Ladies and gentlemen, everything you have heard is exactly the reason that rape victims don't run to the police because this is what happens. What happens is despite the fact that a woman comes in here and shows you the injuries she has, that you have a medical report of the injuries she has, we're going to spend an hour talking about everything she did that was bad. At one point we hear she's so drunk

---

**14.** If Jessica were believed, it was not at all odd. A victim would not be expected to consent to a vaginal examination if, as here, the perpetrator never inserted his penis, or any other body part, into her vagina.

and so intoxicated.... *And it gets more offensive, doesn't it?* "She was going to go out with two older black males that she didn't know." ... *Everything that you just heard, everything [sic] offensive thing that you just heard, is the reason why women don't report this.*"

(Emphasis added.)

Appellant argues in his brief that the portion of the argument we have emphasized was improper. According to appellant,

> [t]his type of remark serves no purpose but to prejudice the jury against defense counsel and thereby jeopardizes Mr. Jones–Harris' right to be tried by a fair jury that will carefully weigh the evidence presented by both sides. The comment impermissibly appealed solely to the emotions of the jury members and was clearly intended to prejudice them against defense counsel and Mr. Jones–Harris. *Lawson [v. State]*, 389 Md. [570,] 590, 886 A.2d 876 [ (2005) ].

▮▮▮▮ "The prosecutor is allowed liberal freedom of speech and may make any comment [in closing argument] that is warranted by the evidence or inferences reasonably drawn therefrom." *Grandison v. State*, 341 Md. 175, 224, 670 A.2d 398 (1995) (citations and internal quotation marks omitted). *See also Degren v. State*, 352 Md. 400, 432–37, 722 A.2d 887 (1999) (attorneys enjoy great leeway during closing argument). Rather, "[r]eversal is only required where it appears that the remarks of the prosecutor actually misled the jury or were likely to have misled or influenced the jury to the prejudice of the accused." *Spain v. State*, 386 Md. 145, 158, 872 A.2d 25 (2005) (quotation marks and citation omitted); *see also Lawson v. State*, 389 Md. 570, 580–81, 886 A.2d 876 (2005).

▮▮▮ Whether a prosecutor's remarks in closing were improper and prejudicial, or simply a permissible rhetorical flourish, is within the sound discretion of the trial court to decide. *Degren*, 352 Md. at 431, 722 A.2d 887 (citation omitted). We are mindful that,

> [i]n considering whether, in the first instance, any of the remarks attributed to the prosecutor had the effect of

unfairly creating prejudice against the defendant, recognition must be given to the fact [that] the trial judge, who presides in the arena where the forensic adversaries are engaged, is in the best position to evaluate and assess—in the context in which the remarks are made and their relationship to other factors in the trial—whether they were in fact prejudicial.

*Wilhelm v. State,* 272 Md. 404, 429, 326 A.2d 707 (1974) (citations omitted).

We see nothing improper about the just-quoted remarks of the prosecutor. Although the language used by the prosecutor was harsh, it amounted to nothing more than fair comment. A substantial part of what defense counsel said was offensive, most notably (1) comparing Jessica's actions to those in a lewd video; (2) impliedly criticizing Jessica for dating "older black males"; (3) without any factual basis, suggesting that Jessica's parents objected to her dating African–Americans and that she had engaged in consensual vaginal intercourse with appellant; and (4) challenging Jessica's claim to be a virgin based on the fact that (a) she had shaved her pubic hair and (b) she did not allow a vaginal exam. Under the circumstances, what the prosecutor said in response comes well within the ambit of a "permissible rhetorical flourish." *Degren,* 352 Md. at 431, 722 A.2d 887.

 Finally, appellant claims that he was prejudiced when the prosecutor spoke the words set forth below, which we have emphasized.

[PROSECUTOR:] . . . Do you believe that if someone's going to make up an assault they're going to have such unusual details? "After he cut me as he punched me, he took the sleeve of his shirt and tried to wipe it off." I mean that's just too weird, that's got to be true. *The bottom line is this, ladies and gentlemen, there is no evidence, none that Ace didn't do this.* But instead of focusing on that, instead of focusing on the fact that—

[DEFENSE COUNSEL]: Objection.

[PROSECUTOR]:—we've given you—

THE COURT: Overruled.

[DEFENSE COUNSEL]: Ask to approach?

THE COURT: Overruled.

[PROSECUTOR]: No. Instead of ... them saying, "Well, yeah, there's this big mountain of evidence," what they want you to do is ignore it, ignore it and focus in on my slutty little victim. Are you willing to do that? Are you willing to say, We have physical evidence here. We have all of this evidence. We have all of these injuries to this girl. We have the fact that she has anal tearing. We know ... from photographs that she's bruised, but we're going to ignore it because let's face it, folks, she got what she deserved. She was out there ... playing loose, and this is what happened? I don't think you can do that. . . .

According to appellant, the emphasized part of the above argument,

> implied to the jury that, without any evidence refuting the State's witnesses, they must convict Mr. Jones–Harris. The prosecutor thus implied to the jury that Mr. Jones–Harris had a duty to present evidence to show his innocence, rather than that the State's evidence had to establish guilt beyond a reasonable doubt. This was improper. *Lawson,* 389 Md. at 600, 886 A.2d 876.

We agree with appellant that the emphasized portion of the prosecutor's argument was improper. A prosecutor may not "comment upon the defendant's failure to produce evidence to refute the State's evidence." *Eley v. State,* 288 Md. 548, 555 n. 2, 419 A.2d 384 (1980); *Garrison v. State,* 88 Md.App. 475, 480, 594 A.2d 1264 (1991). But not every improper remark by a prosecutor in closing argument requires reversal of the conviction. *See Hill v. State,* 355 Md. 206, 224, 734 A.2d 199 (1999).

In this case, when one considers the one isolated improper statement in the context of what else was said by the prosecutor and defense counsel, appellant was not prejudiced by the errant remark. In this regard, it is first important to

consider the fact that the trial judge instructed the jury, in the clearest terms, as follows:

> The defendant is presumed to be innocent of the charges. This presumption remains with the defendant throughout every stage of the trial and is not overcome unless you are convinced beyond a reasonable doubt that the defendant is guilty. The State has the burden of proving the guilt of the defendant beyond a reasonable doubt. This burden remains on the State throughout the trial. *The defendant is not required to prove his innocence. . . .*

(Emphasis added.) In light of this instruction, it is difficult to see how the jurors could have been misled into believing that appellant was required to prove his innocence.

Second, this does not appear to have been a close case. For a juror to believe that appellant was innocent, he or she would have to conclude either that the victim: (a) invented the story concerning the vile acts forcibly perpetrated against her by appellant even though, after being in appellant's company for about forty minutes, she indisputably suffered a black eye, fractured nose, and injury to her legs; *or* (b) consensually engaged in fellatio and anal sex with appellant, and then, for some unknown reason, bitterly complained about it shortly thereafter to her friends and family. The difficulty in persuading a jury to acquit under such circumstances was unlikely to have been caused by the isolated remark by the prosecutor. Therefore, we hold that the trial court's error in failing to sustain defense counsel's objection was harmless beyond a reasonable doubt. *See Dorsey v. State,* 276 Md. 638, 658, 350 A.2d 665 (1976).

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**